5 Fed 855
44 Ind 451
1 LRA 332
3 LRA 770
9 LRA 114

LAKE SHORE AND MICHIGAN SOUTHERN RAILWAY CO.

*v.*

EDWARD S. RICHARDS, Survivor.

*Filed at Ottawa June 19, 1894.*

1. CONSTITUTIONAL LAW—*jurisdiction of Supreme Court on questions of fact.*   Section 89 of the Practice act, which restricts the jurisdiction of the Supreme Court to questions of law, only, in all cases except those enumerated, is constitutional and valid.

2. WAIVER—*motion to take case from jury—how waived.*   A motion made at the close of plaintiff's evidence to instruct the jury to return a verdict for defendant is in the nature of a demurrer to evidence, and if the defendant desires to avail himself thereof he should abide by such motion.   By introducing evidence, and submitting the case to the jury without renewing the motion, the error, if any, is waived.

3. INSTRUCTIONS—*when may take case from jury.*   An instruction taking the case from the jury and directing a verdict for defendant should only be given where the evidence, with all the legitimate and natural inferences to be drawn therefrom, is wholly insufficient, if credited, to sustain a verdict for the plaintiff.

4. SAME—*how far reviewable in Supreme Court.*   All the Supreme Court can properly do, when the failure to take the case from the jury is presented, is to determine whether there was evidence before the jury tending to support the plaintiff's cause of action as stated in his declaration.

5. CONTRACT—*rights of parties, upon rescission.*   Upon the rescission of a contract by one party for the breach of it by the other, damages for the loss of expenditures or of profits cannot be allowed to the party rescinding.

6. SAME—*choice of remedies on breach.*   Where one party repudiates the contract, the injured party has an election to pursue either of three remedies:   He may (1) treat the contract as rescinded, and recover upon *quantum meruit* so far as he has performed; or (2) keep the contract alive for the benefit of both parties, being at all times himself ready and able to perform, and at the end of the time specified sue and recover under the contract; or (3) treat the repudiation as putting an end to the contract for all purposes of performance, and sue for the profits he would have realized if he had not been prevented from performing, continuing the contract in force for the latter purpose only.

7. SAME—*when excuse for non-performance must be shown.*   Where the injured party elects to keep the contract in force for the purpose of recovering future profits, treating the contract as

| | |
|---|---|
| 152 | 59 |
| 152 | 329 |
| 152 | 59 |
| 160 | 322 |
| 152 | 59 |
| 156 | 419 |
| 157 | 410 |
| 157 | 461 |
| 158 | 398 |
| 158 | 626 |
| 152 | 59 |
| 61a | 336 |
| 152 | 59 |
| 63a | 39 |
| 64a | 292 |
| 65a | 657 |
| 152 | 59 |
| 166 | 478 |
| 67a | 178 |
| 152 | 59 |
| 168 | 45 |
| 168 | 517 |
| 168 | 614 |
| 152 | 59 |
| 170 | 92 |
| 71a | 294 |
| 71a | 315 |
| 152 | 59 |
| 74a | 41 |
| 75a | 41 |
| 75a | 242 |
| 152 | 59 |
| 77a | 439 |
| 152 | 59 |
| 87a | 154 |
| 88a | 257 |
| 88a | 414 |
| 152 | 59 |
| 90a | 3370 |
| 152 | 59 |
| 92a | 6581 |
| 152 | 59 |
| 191 | 8325 |
| 152 | 59 |
| 194 | 3382 |
| 101a | 3473 |
| 152 | 59 |
| 115a | 6229 |

repudiated by the other party, he must allege and prove performance on his part, or a legal excuse for non-performance.

8. SAME—*what will excuse performance.* Any act, conduct or declaration by one party to an executory contract,evincing a clear intention to repudiate the contract and treat it as no longer binding, amounts, in law, to a "prevention" of performance. The act which thus prevents performance need not amount to physical obstruction, nor render the contract impossible of execution, nor need it be the breach of a condition precedent. It is enough if a clear determination is evinced no longer to be bound by or to perform the contract. *Christian County* v. *Overholt,* 18 Ill. 223, *Palm* v. *Ohio and Mississippi Railroad Co.* id. 217, *Leopold* v. *Salkey,* 89 id. 412, and *Selby* v. *Hutchinson,* 4 Gilm. 319, commented upon and explained.

9. FORMER RECOVERY—*recovery for breaches no bar to future profits.* It is no bar to a recovery of future profits by the injured party, that he had once sued and recovered for actual breaches of the contract, treating the contract, for that purpose, as subsisting, provided it appears that the party guilty of the breaches persisted, after the first suit was brought, in further preventing performance.

10. EVIDENCE—*effect of, controlled by counsel's statement.* Evidence of expenditures which were not a proper element of damages, but which, when offered, were distinctly stated in the jury's presence not to be offered with a view to damages, will not be taken to have misled the jury.

11. SAME—*upon matters not in dispute.* The improper admission in evidence of letters which related entirely to a matter not controverted in the case, is not reversible error.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. JULIUS S. GRINNELL, Judge, presiding.

This was a suit in assumpsit, brought by Edward S. Richards, surviving partner of the firm of Richards, Maynard & Co., against the Lake Shore and Michigan Southern Railway Company, to recover damages for breaches of a contract, the material provisions of which will be stated presently. Prior to the execution of said contract, grain brought by western railroads to Chicago, and destined, either before or upon its arrival in that city, for transportation by rail to the east, was delivered

by the western to the eastern railroads, and was by the latter weighed and transferred from western to eastern cars. At that time the transfer of such grain was accomplished by placing the loaded and empty cars side by side on parallel tracks, and by shoveling the grain from one car to the other by hand. The weighing was done on track scales, by first weighing the loaded car and then weighing it after it was unloaded, the difference between such weights being the weight of the grain. This process was expensive, and the weights thus obtained, as the evidence tends to show, were, owing to a variety of causes, liable to be inaccurate. Richards, the plaintiff, was the inventor and patentee of a new process for weighing and transferring grain in bulk, which was claimed to be cheaper than the old method, and which furnished more accurate weights than could be had by the existing mode of weighing. By this process the loaded cars of grain were run on to an elevated track in a transfer house, and empty cars were placed alongside of them on a lower track. The grain was then shoveled by steam shovels from the loaded cars into hoppers, where it was weighed, and then allowed to run, by force of gravity, into the empty cars below. Negotiations were thereupon entered into between Richards and the defendant company, with a view to the adoption by the latter of this new mode of weighing and transferring grain, and these negotiations resulted in a written contract between the company, of the first part, and Richards, of the second part, bearing date January 2, 1884, which contract was afterwards assigned by Richards to the firm of Richards, Maynard & Co., consisting of Richards and John W. Maynard. Said contract recited, by way of preamble, that one of its objects was to provide a cheaper method of transferring grain, mill-feed and seed from one car to another than the one employed by said company, and for that purpose to use the device of Richards, secured to him by letters patent, etc., and

that Richards intended to erect and build a grain transfer house on the land thereinafter described, for the purpose of so handling, weighing and transferring in bulk such grain, mill-feed and seed as might be delivered to him for that purpose by the company. The company then agreed, in consideration of the nominal rental of $10 per year, and of the covenants in the contract to be kept and performed by Richards, to lease to him, for the term of ten years, certain land upon which to erect such transfer house and the necessary approaches thereto, and also agreed that, as soon as such transfer house and approaches were constructed, it would build and maintain thereon, and through such transfer house, such track or tracks as might be necessary to transact the business contemplated by said agreement, and do all switching of loaded and empty cars to and from said transfer house at its own expense and without cost to Richards, provided that the actual cost thereof should be taken into account in determining the fair amount to be paid Richards, as provided in the following covenant :

"*Third*—Said first party further covenants and agrees, that in case there shall be any saving to it, in switching, weighing and transferring of products in this agreement referred to, through the methods and devices adopted by said second party, over and above the actual cost of doing the same work under the ways and methods now in use by said first party, then and in that event it will pay to second party one-half of said saving, the just and actual amount thereof to be ascertained and determined as provided in covenant 'First' of 'Mutual Covenants,' said amounts, if found due, to be paid to said second party on or before the middle of each month for the month preceding. "

Richards, on his part, agreed, at his own cost and expense, to construct and maintain, for the full period of ten years, on said land, a transfer house and approaches, suitable and proper for carrying out the purpose in said

contract expressed, and furnish and supply said house with hopper scales and every other device necessary to properly weigh and transfer said grain, etc. He also covenanted as follows:

"*Second*—That he will receive, weigh and transfer all products contemplated by this agreement which may be delivered to his said transfer house by or under the direction of said first party, with promptness and dispatch, and within such time as to prevent any accumulation of cars or freight, whereby shippers might have just ground of complaint, and if said second party shall fail to transfer as fast as required, the said first party may transfer by such other method as it deems proper; and said second party shall do all said work in transfer house at his own cost and expense, without cost to said first party, provided that the actual cost of doing said work shall be taken into account in determining the saving, if any, between the Richards method of transferring grain and the methods in use by the first party at the date of this agreement, and also for the purpose of determining the just amount to be paid to said second party, as provided in covenant 'Third' of first party, provided, also, that the cost of weighing such products shall not be considered in determining the actual cost of such transfer."

Said contract then contained various paragraphs denominated "Mutual Covenants," the first of which provided the mode for ascertaining and determining the cost of transferring grain, etc., by the new method, and the amount of money thereby saved. The only other provisions of the contract material to the present controversy are the third, fourth and sixth of said "Mutual Covenants," which are as follows:

"*Third*—And it is mutually covenanted and agreed that all shipments originating at points west of Chicago, and properly billed through to eastern points and requiring transfer through said house, shall be classed 'through shipments,' and be transferred in the same manner as

re-consigned property, and upon the same basis of cost to said first party; it being specially understood and agreed that under no circumstances is said first party to be charged for any weights upon any transfers made through this house; but nothing in this agreement contained shall be so construed as to prevent said second party from charging such fees as may be agreed upon between him and the owner of the property delivered, for weights and transfer, and for such other service as he may render in connection therewith, and from collecting his charges as provided in following mutual agreement.

"*Fourth*—It is further mutually understood and agreed that said second party is to receive his compensation for his time, labor and investments employed in building, operating and maintaining said transfer house, entirely from the weighing of property passing through it, and · from the owners thereof, and not from said first party, except as provided in covenant 'Third' of said first party; and said first party shall not make use of the weights obtained from said second party in the conduct of its business for any other purpose than billing property to destination, but upon the request of said second party, said first party will collect such weighing charges as he may show are due to him, in the same manner as other advanced charges are collected, and pay the amount so collected to said second party on or before the middle of each and every month.

"*Sixth*—If, at any time, differences should arise between the said parties hereto as to its spirit, meaning or execution, such differences shall be settled by a reference of all matters in dispute to three disinterested arbitrators, each of the parties hereto to select one, and the two so chosen to select a third, and the decision of any two of the court so formed shall be binding between the parties hereto, final and without appeal."

The declaration, after setting forth said contract *in hæc verba*, alleges that on the 23d day of January, 1884,

the plaintiff assigned all his interest in said contract to
the firm of Richards, Maynard & Co., and that said as-
signment was ratified and confirmed by the defendant;
that said firm thereupon erected on the land described in
the contract, a grain transfer house and hopper scales,
and all machinery pertaining thereto, the same being
completed June 24, 1884, when said firm entered upon
the business of transferring grain, etc., from car to car,
and weighing the same, as provided for in the agree-
ment; that said firm could not conveniently transfer
mill-feed through their transfer house, and that the
right to have such transfer of mill-feed, and the weigh-
ing thereof, was waived by the defendant; that said
firm continued to transfer and weigh all such grain and
seed as were presented to them by the defendant at their
transfer house to be transferred and weighed, until June
16, 1886, and kept and performed the contract on their
part, yet the defendant, although often requested so to
do, has not kept and performed said contract on its part;
that on June 16, 1886, the defendant abandoned said con-
tract, and neglected and refused to perform it, and with-
out reasonable or just cause refused to be bound thereby;
that after the abandonment of said contract by the de-
fendant and its refusal to perform the same, to-wit, in
December, 1887, said Maynard died; that said firm and
the plaintiff have always been ready and willing, and
have offered the defendant, to continue in the service
and employment of the defendant in weighing and trans-
ferring grain and seed, as provided by said contract;
that the weights so obtained by said firm in weighing
and transferring grain and seed were of the value of
$1.40 per car, and that the number of cars annually
transferred on the track to the cars of the defendant
company amounted to 18,000; that, to-wit, 18,000 cars of
grain and seed per annum will continue to be transferred
on said track to the cars of the defendant company; that
the saving to the defendant in the switching, weighing

and transfer of grain and seed by the plaintiff's method is $5000 per annum; that the plaintiff's firm was obliged to and did lay out and expend, in building and equipping their transfer house, a large sum of money, and that said transfer house is valuable only for the purposes contemplated by said agreement, and that in consequence of the refusal of the defendant to be bound by the terms of said contract said transfer house has become of no value, whereby the plaintiff has suffered damage in the sum of $25,000; that there is due to the plaintiff from the defendant, on account of such nonperformance of said contract by it, a large sum of money, to-wit, the sum of $300,000, being the amount of damage to and amount due the plaintiff by reason of the breach of said contract, from the date the defendant wrongfully refused to perform said contract on its part.

By an amendment to said count the plaintiff claimed special damages for loss of profits which said firm, or the plaintiff, as survivor, would have received from the various shippers of grain but for said breach of contract, and alleged that said firm, or the plaintiff, as its representative, had a contract with the receivers and shippers of grain and seed at Chicago, for the purchase by them of the weights of grain and seed which said firm, or the plaintiff, as survivor, obtained or would have obtained in transferring grain and seed from the cars of western railroads having their termini at Chicago, to the cars of the defendant company; that but for said breach of said contract, said firm, or the plaintiff, as survivor, would have received seventy cents per car from such receivers and shippers of grain and seed at Chicago for the weights of 15,000 cars of grain and seed per year for eight years,—the unexpired term of said contract.

The defendant pleaded *non assumpsit*, and also a special plea, alleging, in substance, that at the July term, 1886, of the Superior Court of Cook county, the plaintiff and said Maynard exhibited their bill in chan-

cery against the defendant in said court, for the non-performance of the same identical promises and undertakings in the declaration mentioned; that at the March term, 1887, of said court, the defendant was decreed to be indebted to said complainants for such non-performance of said promises and undertakings; that said cause was referred to a master in chancery for an accounting, to ascertain the amount of such indebtedness; that the master found that the defendant was indebted to said complainants in the sum of $9686.68 damages; that the court confirmed such finding, and entered a decree ordering the defendant to pay the complainants that sum and costs; that while an appeal to the Appellate Court from said decree was pending, Maynard died; that said appeal, being prosecuted against the present plaintiff, as survivor, was afterwards affirmed by the Appellate Court, and that thereupon the defendant paid and satisfied the same.

To said special plea the plaintiff replied that the cause of action set out in the declaration was not for the non-performance of the same promises and undertakings in said plea mentioned and for which said decree was rendered, but for the non-performance of other and different promises and undertakings from the defendant to the plaintiff.

At the trial, which was had before the court and a jury, evidence was offered by the plaintiff tending to sustain the cause of action alleged in his declaration, and the jury thereupon returned their verdict finding the issues for the plaintiff, and assessing his damages at $75,000. For this sum and costs the court, after denying the defendant's motion for a new trial, gave judgment for the plaintiff. On appeal to the Appellate Court said judgment was affirmed, and this appeal is from said judgment of affirmance.

Mr. John N. Jewett, for the appellant:

The Supreme Court of Illinois is a creation of constitutional law. Its jurisdiction and right to do justice are matters of constitutional assignment in the division of governmental powers, which legislation cannot take away.. It ought not to consent to degrade itself into a mere tool of legislation by a surrender of its independence at the dictates of the political power. Mere legislation, as such, cannot take away from this court its inherent and constitutional power to do justice to the parties before it, in accordance with the facts presented by the records and the law applicable thereto. The facts of the case, rationally determined, are the surest guides to a right application of the law.

The rule, well settled by decisions in this court and elsewhere, is, that to justify one party to a contract in suspending its execution and at the same time entitling him to sue for and recover as damages the future profits which might have been realized by its complete execution, the other party must have been guilty of a breach, such as, in effect, prevented or absolutely put an end to the further execution of the contract by the complaining party. · *Selby* v. *Hutchinson,* 4 Gilm. 319; *Palm* v. *Railroad Co.* 18 Ill. 217; *Webster* v. *Enfield,* 5 Gilm. 300; *Bond* v. *Bragg,* 17 Ill. 69; *Lucas* v. *Harrington,* 21 id. 31; *Doggett* v. *Brown,* 28 id. 495; *Graham* v. *Anderson,* 42 id. 517; *Barrelett* v. *Bellgard,* 71 id. 281; *Weintz* v. *Hafner,* 78 id. 29; *Wilson* v. *Bauman,* 80 id. 494; *Papineau* v. *Belgarde,* 81 id. 62; *Leopold* v. *Salkey,* 89 id. 421; *Bonnet* v. *Glattfeldt,* 120 id. 175; *Christian County* v. *Overholt,* 18 id. 223; *Chapin* v. *Norton,* 6 McLean, 500; *Dobbins* v. *Higgins,* 78 Ill. 440; *Keenen* v. *Brown,* 21 Vt. 86; *Norrington* v. *Wright,* 115 U.S. 188.

Action, as based upon these alleged delinquencies, was not taken by Richards, Maynard & Co. until June, 1886. This was too late. In such cases prompt action is required in order to justify even an act of rescission,

and what is reasonable time is a question of law, to be determined by the court.   *Holbrook* v. *Burt*, 22 Pick. 546; *Kingsley* v. *Wallis*, 14 Me. 57; *Negley* v. *Lindsay*, 67 Pa. St. 217; *Leaming* v. *Wise*, 73 id. 173.

An agreement to arbitrate creates no binding obligation.   It is revocable by either of the parties to it at any time before an award is actually made and published. Such an agreement does not oust the court of jurisdiction.   It cannot be pleaded in bar of a suit, nor will the court compel specific performance of it.   Mitford's Pl. 264; *Gourlay* v. *Duke of Somerset*, 19 Ves. Jr. 430; *Thompson* v. *Charnock*, 8 D. & E. 139; *Mitchell* v. *Norris*, 2 Ves. Jr. 129; 2 Parsons on Contracts, 707, 708.

Mr. PLINY B. SMITH, and Mr. JAMES I. BEST, also for the appellant :

The appellant maintains, that since the appellee alleged that Richards, Maynard & Co. performed the contract until the 16th day of June, 1886, and were then ready and willing to proceed with its performance, but that the appellee refused to carry out the contract on its own part and abandoned its performance, he must prove such breach as alleged.   *Leopold* v. *Salkey*, 89 Ill. 412; *Badgley* v. *Heald*, 4 Gilm. 64; *Swanzey* v. *Moore*, 22 Ill. 63.

In the absence of a contract for the sale of weights, the loss of such prospective sales is entirely too contingent, uncertain and remote to constitute an element of damages. *Frazer* v. *Smith*, 60 Ill. 145; *Homer* v. *Wood*, 16 Barb. 386; *Olmstead* v. *Burke*, 25 Ill. 86; *Hill* v. *Parsons*, 110 id. 107.

The mere failure to pay money, though it is conceded to be due, will not, as a rule, authorize a party to abandon his contract and bring an action for future profits. *Palm* v. *Railroad Co.* 18 Ill. 217.

Messrs. PENCE & CARPENTER, and Mr. WILLIAM A. GARDNER, for the appellee :

When a party, by his acts and conduct, manifests an intention not to be bound by his contract, he thereby, in

legal contemplation, *prevents* the performance of such contract by the other party, and all the courts hold that the manifestations of such an intention by one party authorize the other party to the contract to sue upon it for damages or future profits. *Ripley* v. *McClure*, 4 Exch. 344 ; *Kadish* v. *Young*, 108 Ill. 177; *Cort* v. *Railway Co.* 17 Ad. & El. 127; *Chamber of Commerce* v. *Sollitt*, 43 Ill. 523 ; *Hochster* v. *De Latour*, 2 Ellis & B. 678; *Railway Co.* v. *Xenos*, 11 C. B. (N. S.) 151 ; *Frost* v. *Knight*, L. R. (7 Exch.) 111; *Leeson* v. *Oil and Candle Co.* Irish Rep. (8 C. L.) 309 ; *Roper* v. *Johnson*, L. R. (8 C. P.) 167; *Ex parte Stapleton*, L. R. (10 Ch. Div.) 586; *Hinckley* v. *Steel Co.* 121 U. S. 264; *Grau* v. *McVicker*, 8 Biss. 13; *Mitchell* v. *Adams*, 16 W. Va. 245 ; *Dugan* v. *Anderson*, 36 Md 567; *Crist* v. *Armour*, 34 Barb. 378; *Howard* v. *Daly*, 61 N. Y. 362; *Fox* v. *Kitton*, 19 Ill. 519; *McPherson* v. *Walker*, 40 id. 371; *Follansbee* v. *Adams*, 86 id. 14.

Mr. Justice Shope delivered the opinion of the court :

It is insisted in this court that the evidence is insufficient to sustain the verdict and judgment. The right and duty of this court to review the facts are placed upon two grounds : First, that under section 2, article 6, of the constitution, which provides, "the Supreme Court shall consist of seven judges, and shall have original jurisdiction in cases relating to the revenue, in *mandamus* and *habeas corpus* cases, and appellate jurisdiction in all other cases," the provisions of section 89 of the Practice act, restricting the power of this court to the consideration of questions of law, only, and prohibiting the assignments of error calling in question the judgment of the Appellate Courts upon questions of fact, are unconstitutional and void.

We have so frequently held the act valid that it would seem to be no longer an open question. But if it was, the correctness of former holdings in this regard is clearly authorized by the provisions of section 11 of the

same article of the constitution. It is there provided, that after the year 1874 inferior Appellate Courts, of uniform organization and jurisdiction, may be created by the legislature, to which such appeals and writs of error as the General Assembly shall provide may be prosecuted, "and from which appeals and writs of error shall lie to the Supreme Court in all criminal cases, and cases in which a franchise or freehold or the validity of a statute is involved, and *in such other cases as may be provided by law.*" Under this provision the legislature was authorized to vest such courts with appellate jurisdiction in all such cases as, in the legislative discretion, were deemed proper.

In four classes of cases,—that is, criminal cases, and those involving a franchise or freehold or the validity of a statute,—the legislature is prohibited from making the determination of such Appellate Courts final. In such cases appeals and writs of error must be allowed to the Supreme Court. In all other cases in which such courts are given jurisdiction by statute it is left by the constitution discretionary with the legislature to make the judgments of those courts final, or to provide for further appeal or writ of error, as in the legislative discretion shall be deemed proper. It necessarily follows, that since the creation and organization of the Appellate Courts the jurisdiction of this court to review the final judgments of those courts, except in the four classes of cases enumerated in the constitution, is subject to the restrictions created by the legislature, and it follows that we are precluded from the consideration of any assignment of error questioning the determination of the Appellate Court upon questions of fact.

At the close of plaintiff's evidence in chief, the defendant moved the court to instruct the jury to return a verdict in its favor, upon the ground that the evidence was insufficient to maintain the cause of action set forth in the declaration, which was overruled. The motion was

in the nature of a demurrer to the evidence, and if defendant desired to avail itself thereof it should have abided by it. Instead of doing this it introduced evidence in its behalf, and submitted the cause to the jury without renewing its motion, thereby waiving the error, if error there was, in the decision of the court. *(Joliet, Aurora and Northern Railway Co.* v. *Velie,* 140 Ill. 59.) The defendant, however, by its instructions 1, 2 and 3, refused by the court, sought to raise the same question. By these instructions the court was asked to instruct the jury, first, the evidence was not sufficient to sustain a verdict for plaintiff; second, there was a variance between the proof and cause of action stated in the declaration; and third, that the evidence did not show an abandonment of the contract by the defendant, and the verdict should therefore be for the defendant.

Instructions taking the case from the jury should only be given where the evidence, with all the legitimate and natural inferences to be drawn therefrom, is wholly insufficient, if credited, to sustain a verdict for the plaintiff. (*Simmons* v. *Chicago and Tomah Railroad Co.* 110 Ill. 340; *Purdy* v. *Hall,* 134 id. 298; *Pullman Palace Car Co.* v. *Laack,* 143 id. 242, and cases cited.) Where there is evidence tending to sustain the issues in behalf of the plaintiff, the weight to be given thereto must be submitted to the jury, and when their finding of fact has been approved by the trial and Appellate Courts, no question of the sufficiency of the evidence to support the verdict can be raised in this court. It will be proper, therefore, to so far examine the evidence as to enable us to determine whether there was evidence tending to support the plaintiff's cause of action, as alleged in his declaration.

In the discussion which will follow, it will become apparent that we are of opinion that there was evidence tending to sustain plaintiff's cause of action, as alleged, and that therefore said instructions were properly refused. Whether the evidence, when considered together, is suffi-

cient to maintain the plaintiff's case, is a question which does not fall within our province to determine.

The principal question to be determined in this case arises upon the second and third instructions given at the instance of the plaintiff, as follows :

2. "If the jury believe, from the evidence, that 'the defendant, by its acts and conduct, showed an intention not to be bound by said contract, then said Richards, Maynard & Co. had the right to treat said contract as abandoned by said defendant, and to bring suit for the recovery of damages at any time thereafter, unless you believe, from the evidence, that the defendant company receded from such intention not to be bound, prior to the time when said plaintiff chose to treat said contract as abandoned by the defendant. An intention can only be known by acts, conduct or declaration. Your inquiry in this connection is, first, did defendant, by act and conduct, violate the substantial terms of the contract, and commit breaches in substantial provisions thereof; second, did such acts and conduct, if you believe, from the evidence, they existed, warrant the conclusion that they would be continued, and that it was the intention of the defendant to continue such acts and conduct.

3. "If the jury believe, from the evidence, that the defendant railway refused to and did not live up to its said contract in its substantial provisions, and refused to perform it according to its terms, and abandoned the same without the fault of Richards, Maynard & Co., and that defendant prevented Richards, Maynard & Co. from performing the substantial provisions of said contract according to its terms, then the plaintiff is entitled to recover; and it is not necessary that Richards, Maynard & Co. should have been prevented from performing said contract by physical force, in order to give them the right to treat said contract as abandoned by the defendant railway, and to recover damages from said defendant company in this suit. If the jury believe, from the

evidence, that said defendant railway refused to and did not live up to its said contract, and refused to perform it according to its terms, and if you believe, from the evidence, that defendant defeated the substantial object of the contract, or rendered it unattainable by proper performance on the part of the firm of Richards, Maynard & Co., and that defendant prevented Richards, Maynard & Co. from performing the said contract according to its terms, as above suggested, then the jury may find for the plaintiff, and assess the damages at such a sum as they believe, from the evidence, that the plaintiff has suffered by reason of such breach."

Bearing upon the same proposition, more or less directly, the court gave to the jury, at the instance of the defendant, its seventh, twelfth, sixteenth and seventeenth instructions, as follows :

7. "You are instructed that if the defendant committed breaches of the contract, still, if, from the evidence, you believe that such breaches did not defeat the substantial objects of the contract, or render it unattainable by proper performance on the part of the firm of Richards, Maynard & Co., then the plaintiff cannot recover, and your verdict must be for the defendant. '

12. "The jury are instructed, as a matter of law, that a mere failure or refusal of the defendant to pay to plaintiff, or the firm of Richards, Maynard & Co., any sum of money demanded by him or them, and claimed to be on account of services previously rendered by said firm under the contract in question, can not be construed or treated as an *abandonment* of the said contract by the defendant, entitling the plaintiff or his said firm to maintain the present action, which is solely for the recovery of such profits as might have accrued to the plaintiff or his firm, if, on their part, said contract had been fully executed continuously for the period limited by said contract."

16. "The jury are further instructed, as a matter of law, that in order to entitle the plaintiff to recover in this case, it is necessary for him to establish, by a preponderance of evidence, that he and the firm of Richards, Maynard & Co. were by the acts of the defendant prevented from the performance of said contract on their part, or that the execution of the said contract on their part was interrupted by, and as the legitimate consequence of, the acts of the defendant, in disregard of its obligations under said contract.

17. "The failure of the defendant to pay, when demanded, any moneys due and owing to plaintiff under the contract was not such an act or omission, in itself, on the part of defendant, as to prevent the plaintiff completing the contract."

Upon an examination of the evidence for the purpose of determining the propriety of the instructions, it will be found that it tends to prove that shortly after the plaintiff's firm had, in pursuance of the contract, constructed and equipped their transfer house and commenced the weighing and transfer of grain therein, controversies arose between the parties as to the proper construction of the contract, the rights of the plaintiff and the duties and obligations of the defendant thereunder. It was claimed by the defendant that it was not required by the contract to deliver to the plaintiff's firm, to be by them weighed and transferred, all of the grain received by the defendant from western railroads for transportation to the east over its lines, but that it had the option to deliver, to be thus weighed and transferred, only such grain as it chose to deliver, and had the right to divert from plaintiff's transfer house, and was at liberty to transfer and weigh, all or such part of the grain received by it from western railroads as it thought proper, by other modes, and, acting on that interpretation of the contract, it did in fact withhold large amounts of grain from the transfer house, and had the same

transferred by other methods, thereby depriving the plaintiff's firm of a considerable portion of the business to which they were entitled by the terms of the contract. And also, that soon after the transfer house was open, and during all the time it was in operation, the defendant claimed the right under the contract, and adopted and persisted in the practice, of using the weights obtained from the plaintiff's firm for other purposes than that of billing the property weighed to its destination,— that is to say, by giving away such weights to the western railroads over which the property had been brought to Chicago,—thus placing it out of the power of plaintiff's firm to make sales of such weights to western railroads and others, and thereby depriving the firm of practically the only source of profit secured to them by the contract. It will also appear that the evidence tends to show that other differences arose as to the amount to be paid by the defendant on account of the expense of transferring through the transfer house, and as to the basis upon which the cost thereof should be computed, etc.

The construction placed upon this contract, in respect of the matters of difference before mentioned, by this court in *Lake Shore and Michigan Southern Railway Co.* v. *Richards*, 126 Ill. 448, relieves us of the necessity of again construing it. We there held that both the giving away of weights to the western railroads, and the refusal of appellant company to deliver to plaintiff's firm, for weighing and transfer, all grain received by it for transportation from western railroads, were violations of its contract. It was there found that the market value of the weights was seventy cents per car, and that the appellant had given away to western railroads the weights of 12,357 cars transferred and weighed by plaintiffs, in violation of the contract. It was also found that many other cars had been transferred and weighed by other methods than through the transfer house of plaintiffs; that 1267

of such cars were transferred on track by appellant in January, February and March, 1885, alone, in violation of the contract. That bill was filed on June 5, 1886, and asked, among other things, a reformation of the contract. The court, by its final decree, refused to reform the contract, but held it to be valid and binding between the parties in the form in which it was executed.

There can be no question that on June 5, 1886, and prior thereto, the evidence tended to show that the defendant was then guilty of breaches of the contract as it was then held to be subsisting and binding between the parties. Aside from the large amount of business diverted by appellant from the transfer house of the plaintiffs, which it was bound to furnish them under the contract as then construed, of the 24,700 carloads of grain and seed which appellant delivered to and permitted to be weighed and transferred through the transfer house, the weights of 12,357 cars, or fifty per cent of the entire business done, was given away by the defendant, in violation of its covenants.

We need not pursue this branch of the case farther. But to these may be added other breaches of the contract by the defendant, which the evidence tends to show, namely, its refusal to pay the transfer charges or expenses, and its refusal to be bound by the stipulations of the contract providing for a submission to arbitration of all differences between the parties in respect of the spirit, meaning or execution of the contract.

It admits of no argument that the principal consideration upon which plaintiff's firm undertook to build, equip and operate their transfer house was the privilege given them of weighing and transferring all grain and seed delivered by western roads to the defendant for transportation eastward over its lines, and the right secured to them to control the weights of the grain thus transferred, and make sale of them to whosoever might desire to purchase. It was clearly contemplated that the

sale of such weights should be the source of profit to
plaintiffs, and, as the result shows, was practically their
only source of profit from the business.   During the time
the transfer house was in operation there is no complaint
that they did not keep and perform their agreements.
By the wrongful act of the defendant in giving away the
weights, more than one-half of the legitimate profits of
the business actually done was taken from them, and by
the wrongful diversion of business they were deprived of
large profits to which they were entitled under their con-
tract.   By the wrongful act of the defendant they were
deprived of a very large proportion of the substantial
consideration upon which the contract was entered into
by plaintiffs.

The evidence tends to show that the defendant, after
the fifth of June, 1886,—the date of filing the bill in the
case referred to,—manifested and declared its intention
to persist in the future in the same course of conduct and
to insist upon the same construction of the contract.
May 13, 1886, the attorney to whom the matter had been
referred by the defendant, in reply to a note enclosing
an itemized statement of account, refused to allow, under
the contract, for weights given away by defendant, and
expressly said, "under the contract the company is not
bound to deliver grain to Richards except at its option."
On June 9, 1886, the defendant's western division super-
intendent wrote to plaintiffs, acknowledging receipt of
statement of May, 1886, for cost of grain and seed trans-
ferred, and disallowing the account, but re-stating the
same in accordance with the interpretation of the con-
tract previously insisted upon by the defendant.   On
June 11, 1886, plaintiff's firm replied, noting the refusal
contained in the letter of June 9, re-stating the balance
due, and notifying the defendant that unless the same
was paid by twelve o'clock M., June 16, plaintiffs would
be compelled to suspend operations, etc.   On the same
day the attorney of the company, to whom the matter

had been referred, wrote the plaintiff's firm that the company could not change the position taken in the letter of the superintendent, and the letter of May 13, 1886, before mentioned. It thus appears that as late as June 11 the company was insisting that under the contract it was not bound to deliver grain to the transfer house of plaintiff's firm except as it chose to do so, and was likewise denying its liability, under the contract, for the weights it had given away, and for transfer charges, etc. No change occurring in the attitude of the parties, plaintiff's firm closed their house on June 16, and notified the defendant accordingly.

As early as September 11, 1885, the plaintiff's firm addressed a communication to the president of the defendant company, asking for an arbitration of the differences between them, under the contract, and naming a person to represent the plaintiff's firm, and again, on March 29, 1886, made a like demand and named an arbitrator to act for and on behalf of the plaintiff's firm. The defendant company declined to submit the matters in difference to arbitration.

The correspondence before referred to, as well as other facts shown, may be fairly said to show a fixed determination on the part of the defendant company, after June 5, 1886, to persist in and continue the same breaches of its contract in the future of which it had theretofore been guilty,—that is, to persistently pursue a course of conduct which would deprive plaintiff's firm of much the larger portion, if not all, of the substantial benefits of the contract. If it might, at its option and will, give away one-half of the weights of cars actually transferred, as it claimed the right to do, it might give them all away. If it was optional with the defendant to deliver for weighing and transfer only such cars of grain received by it from western roads for transportation east over its lines as it might choose, and divert the business from the transfer house at will, the contract ceased to be

operative and binding on the defendant.   Such construction, in effect, was a repudiation of that part of the contract to be kept and performed by the defendant, and was a denial of the right of the plaintiff to have and demand the substantial benefits of the contract as it existed between the parties.

That the breaches of the contract which the evidence tends to establish were such as would justify a rescission thereof by Richards, Maynard & Co., and enable them to recover upon *quantum meruit* or *quantum valebant*, so far as they had actually performed, does not admit of question.   The relief sought is not upon that principle.   The law is familiar that upon rescission of the contract the recovery is confined to the value of the services, etc., rendered, and that damages for the breach, for the loss of expenditures or of profits, would not be allowable. *United States* v. *Behan*, 110 U. S. 338.

It is well settled that where one party repudiates the contract and refuses longer to be bound by it, the injured party has an election to pursue either of three remedies : He may treat the contract as rescinded, and recover upon *quantum meruit* so far as he has performed ; or he may keep the contract alive for the benefit of both parties, being at all times himself ready and able to perform, and at the end of the time specified in the contract for performance, sue and recover, under the contract ; or he may treat the repudiation as putting an end to the contract for all purposes of performance, and sue for the profits he would have realized if he had not been prevented from performing.   In the latter case the contract would be continued in force for that purpose.   Where, however, the injured party elects to keep the contract in force for the purpose of recovering future profits, treating the contract as repudiated by the other party, in order to such recovery the plaintiff must allege and prove performance upon his part, or a legal excuse for non-performance.   As said by Lord COLERIDGE in *Freeth*

*et al.* v. *Burr*, (L. R.) 9 C. P. 208: "In cases of this sort, where the question is whether the one party is set free by the action of the other, the real matter for considera- tion is, whether the acts or conduct of the one do or do not amount to an intimation of an intention to abandon and altogether refuse performance of the contract." His lordship then adds: "I say this in order to explain the ground upon which I think the decisions in these cases must rest. There has been some conflict among them. But I think it may be taken that the fair result of them is as I have stated, viz., that the true question is, whether the acts and conduct of the party evince an intention no longer to be bound by the contract."

It is insisted by appellant that to authorize one party to treat the contract as renounced and abandoned by the other, the breach must have been such, in effect, as to prevent performance by the injured party, or render the further execution of the contract by him impossible. It appears to be the theory of counsel for appellant, that in order to entitle the plaintiff to recover future profits under the contract, the breach by the defendant must have been of a condition precedent to be performed on its part, and which rendered the contract incapable of execution by the other, or some act or conduct on the part of the defendant amounting to a physical obstruc- tion or prevention of performance by the plaintiff. This contention does not commend itself either upon con- siderations of good conscience or convenience, and it will be found not to be sustained by the weight of authority. It would seem to be inequitable, and promotive of no good purpose, to require a party to continue in the per- formance of a contract notwithstanding the refusal of the other party to be longer bound by it. The effect, in many cases, must be great loss to the plaintiff, without any corresponding benefit to the defendant; or, if it be ultimately held that the plaintiff is entitled to recover his expenditures and for his labor in performing, the

amount to be paid by the defendant will be greatly en-
hanced, while the plaintiff would of necessity take the
hazard of increased loss in the event of the defendant's
insolvency.   It would seem to be reasonable and just,
upon the repudiation of the contract by one party, that
the other be held justified in ceasing performance, stop-
ping expenditure, and thus curtailing the damages which
the other party would be ultimately liable to pay, and
to permit recovery, once for all, of the damages that the
injured party will sustain by the non-performance of the
other party, the *locus penitentiœ* being kept open until the
injured party elects to treat the contract as abandoned
by the other and brings suit as for non-performance.

   While the decision should not be made to rest upon
grounds of convenience to the parties, however just and
equitable, (which, in view of the decided cases, need not
be done,) yet the defendant should not be heard to com-
plain, if, after acts and declarations evincing a clear
determination to be no longer bound by or to perform
the contract on his part, the other party treats it as
abandoned by him.   As said in *Frost* v. *Knight*, 7 Exch.
111 :   "It is obvious that such a course must lead to the
convenience of both parties, and though we should be
unwilling to found our opinion upon ground of conve-
nience alone, yet the latter tends strongly to support
the view that such an action ought to be admitted and
upheld.   By acting upon such notice of the intention of
the promisor, and taking timely measures, the promisee
may in many cases avert, or, at all events, materially
lessen, the injurious effects which would otherwise flow
from the non-fulfillment of the contract."   See, also, *Hos-
mer* v. *Wilson*, 7 Mich. 304 ; cases *infra.*

   The right of the plaintiff to have kept his transfer
house in operation and to have been ready at all times
to perform on his part, and, under the construction of
the contract given in *Lake Shore and Michigan Southern
Railroad Co.* v. *Richards, supra,* to have recovered, from

time to time, his damages for breaches thereof, or, at the
end of the term, sued to recover damages for all breaches,
is not questioned in this proceeding.   The plaintiff, how-
ever, in good conscience, while seeking to recover what
he is entitled to under the contract, should do that which
would be of least injury to the defendant, and if the
defendant had repudiated the contract, so as to deprive
the plaintiff of the substantial benefits arising from per-
formance, it ought not to complain that a course was
pursued least prejudicial to it.

The question here presented has not been directly
involved in any of the cases heretofore considered by
this court.   In the cases of *Fox* v. *Kitton*, 19 Ill. 519,
*McPherson* v. *Walker*, 40 id. 371, *Chamber of Commerce* v.
*Sollitt*, 43 id. 519, *Follansbee* v. *Adams*, 86 id. 13, and *Kadish*
v. *Young*, 108 id. 170, the questions involved were deter-
mined upon principles analogous, in some respects, to
those which must control in this case.   In *Kadish* v.
*Young, supra*, a contract was made for the future deliv-
ery of grain.   On the day succeeding the making of the
contract the purchasers gave notice to the seller that
they would not be bound by it, and the question was,
whether such notice created a breach of the contract,
and imposed on the seller the obligation to re-sell the
barley on the market, or make a forward contract for
the purchase of other grain, of like amount and time of
delivery, within reasonable time after the notice, and if
he sold, to credit the purchaser with the amount of the
sale, or give him the benefit of such forward contract,
or whether, notwithstanding the notice, the seller had
the legal right to wait until the day of delivery under
the contract, and then re-sell and charge the purchaser
with the difference, and it was held that the seller was
not bound to act upon the notice, but was entitled, not-
withstanding, to tender, etc., on the day for delivery
fixed by the contract.   In the opinion by the late Mr.
Justice Scholfield the authorities were reviewed, and

the cases of *Cort* v. *Ambergate, etc. Railway Co.* 6 Eng. L. and Eq. 230, *Hochster* v. *DeLatour*, 20 id. 157, *Frost* v. *Knight*, (L. R.) 7 Exch. 111, *Roper* v. *Johnston*, (L. R.) 8 C. P. 167, (4 Moak, 397,) and other English and American cases, are commented upon, approved and held not to be in conflict with *Lee* v. *Patterson*, 8 Taunt. 540, *Philpot et al.* v. *Evans*, 5 M. & W. 475, *Ripley* v. *McClure*, 4 Exch. 230, and other cases, in which it is held that a party to a contract to be performed in the future cannot create a breach by merely giving notice that he will not perform. It will be found, upon examination of *Kadish* v. *Young*, that the learned writer clearly recognized the doctrine that the party receiving the notice might have acted upon it, and accepted and treated the contract as broken.

In *Fox* v. *Kitton, supra,* the question was whether, when a party agrees to do an act at a future time, and before the time for performance arrives declares he will not keep his contract, but repudiates it, the other party may act on such declaration and treat the contract as at an end, and on the authority of *Philpot* v. *Evans*, and *Hochster* v. *DeLatour*, it was held that he might do so. It will be found, also, in *McPherson* v. *Walker*, and *Chamber of Commerce* v. *Sollitt*, that *Cort* v. *Ambergate Railway Co.*, *Hochster* v. *DeLatour*, and other English and American cases holding the same doctrine, are cited with approval, and relied upon as sustaining the decision in those cases.

Before proceeding to an examination of the cases referred to, it is proper to notice other Illinois cases supposed to have some bearing upon the question under consideration. *Selby* v. *Hutchinson*, 4 Gilm. 319, was a case of rescission, merely. It was there said: "In order to justify an abandonment of the contract, and of the proper remedy growing out of it, the failure of the opposite party must be a total one,—the object of the contract must have been defeated or rendered unattainable by" the misconduct or default of the other party. In the subsequent case of *Leopold* v. *Salkey*, 89 Ill. 412, also a

case of rescission, the language of *Selby* v. *Hutchinson* is commented upon, and it is said that case "is not understood as laying down the rule that, to justify an abandonment of a contract, the opposite party must have failed to discharge every obligation imposed on him, but simply that matters which do not go to the substance of the contract, and the failure to perform which would not render the performance of the rest a thing different in substance from what was contracted for, do not authorize an abandonment of the contract, for when the failure to perform the contract is in respect to matters which would render the performance of the rest a thing different in substance from what was contracted for, so far as we are advised, the authorities all agree the party not in default may abandon the contract."

It may be true that there are cases where the party would be justified in rescinding the contract, thereby putting an end to it for all purposes, where he would not be justified in treating it as renounced by the other party, which we are not called upon to decide. Yet it will be found that, under the rule as stated in these cases, as explained in the later case, the party will be entitled to recover future profits. The court, in these cases, was called upon simply to determine whether the facts there presented warranted rescission, and laid down the rule applicable to such facts, without, as a matter of course, intimating a distinction between the case there being considered and cases like that under consideration here.

In the case of *Palm* v. *Ohio and Mississippi Railroad Co.* 18 Ill. 217, the question presented to the court was, whether the failure to pay the consideration for the work agreed to be done, according to the terms of the contract, was such an act as would authorize the other party to treat the contract as renounced and bring suit for future profits, and the court held that it was not. The court say: "In this case we have a contract for the manufacture and delivery of sixteen engines, each to be paid for

on delivery, without any expression or intimation that the parties expected or intended that any extraordinary consequences were to follow if the money was not paid when due. All that the contract provides is, that so much in money and so much in bonds shall become due upon the delivery of each engine. By its terms it simply gives the party a cause of action for that amount.   *   *   * The contract provides for no other penalty or liability, and the law imposes no other, except, perhaps, that this violation of the contract by the defendant in failing to make the payment may justify the plaintiffs in treating the contract as rescinded." Or they could go on and complete the contract, and at the end recover the amount due thereunder. There was in that case no refusal to receive locomotives under the contract, nor were plaintiffs forbidden to complete it, nor was it in any way put out of their power to do so.

Very many of the cases before referred to have been decided since the *Palm case*, which, it must be remarked, cites no authority sustaining the view of that case contended for by appellant in this case. The learned judge who wrote in the *Palm case* says: "I have examined all the authorities referred to by counsel, and have made diligent search myself, but have found no case where the plaintiff has been allowed to recover for losses sustained by not being permitted to complete the contract, unless he has been prevented from going on with his work by the positive affirmative act of the other party, or where the other party has neglected to do some act without which the plaintiff could not, in the nature of things, go on with his contract." After giving instances of conditions precedent, the learned judge holds, as before said, that the failure to pay would not authorize the plaintiff to treat the contract as abandoned by the defendant unless payment, in a specified time and manner, was by the contract made a condition precedent to performance by the plaintiff.

The case of *Christian County* v. *Overholt et al.* 18 Ill. 223, is similar in its facts to the *Palm case*, and is decided upon the same principle. In that case it is said : "The plaintiffs could only recover for prospective profits where they have been prevented from going on, either by some affirmative act of the defendant, as, by being ordered to desist from further work, or by the omission to perform some condition precedent to the further prosecution, as, to furnish or do something necessary to its further progress." The breach there alleged was a failure to pay an installment as it fell due under the contract, and the case was disposed of upon the authority of the *Palm case.*

Stress is laid by counsel upon the words, "prevented from going on." It is apparent from the language of the court, especially in the *Overholt case,* that physical prevention was not contemplated, for the illustration given shows that at least an order to desist from the work would be a prevention, within the meaning of the term as used. While in those cases there was no failure to perform a condition precedent, or a legal prevention from going on with the work under the contract, which would authorize the plaintiffs to treat the contract as repudiated by the other party and sue for prospective damages, and the court so held, still the cases clearly recognize that where there is a failure to perform a precedent condition, or there is a legal prevention of performance by one party, the other may treat the contract as abandoned by him and bring suit for future profits or prospective damages. The same language—*i. e.,* that the party suing must be "prevented" from performance,—has been used in numerous cases, but wherever the attention of the court has been directly called to the sense in which the word has been used, it has been held not to mean that there must be physical prevention, but that any acts, conduct or declarations of the party evincing a clear intention to repudiate the contract and to treat it as no longer binding are a legal prevention of perform-

ance by the other party.   Thus, in *Hosmer* v. *Wilson, supra*, it was held that an absolute refusal of the defendant to accept the manufactured article when it should be completed was to be considered in the same light, as respects the plaintiff's remedy, as an absolute, physical prevention by the defendant,—citing in support, *Cort* v. *Ambergate Railway Co. supra; Derby* v. *Johnson*, 21 Vt. 21 ; *Clash* v. *Marsiglia*, 1 Denio, 317 ; *Hochster* v. *De Latour, supra*.

In *Cort et al.* v. *Ambergate Railway Co. supra*, the plaintiffs contracted to supply the defendants with 3900 tons of iron chairs to be used in railway construction.   They manufactured and delivered various quantities of chairs from May, 1847, until December, 1849, when the defendants informed plaintiffs that they did not want any more and not to send any more, leaving 2113 tons undelivered, whereupon plaintiffs brought suit to recover damages, including loss of profits.   It was objected that to entitle the plaintiffs to recover they should have proved that the chairs had been made and had been tendered in the manner provided by the contract, or at least before the bringing of the suit, etc.   In delivering the opinion of the court, Lord Campbell, C. J., said : "We are of opinion that the jury were fully justified, from the evidence, in finding that the plaintiffs were ready and willing to perform the contract, although they never made and tendered the residue of the chairs.   In common sense, the meaning of  *  *  *  readiness and willingness must be, that the non-completion of the contract was not the fault of the plaintiffs, and that they were disposed and able to complete it if it had not been renounced by the defendants.   What more can reasonably be required by the parties for whom the goods are to be manufactured?"   And after showing that if, after having accepted a part, the defendants resolved not to accept the balance, the effect of compelling the plaintiffs to proceed with the manufacture and tender of them would be the enhancement of the damages the defendants

would be required to pay, his lordship proceeds : "Upon
the last issue, was there not evidence that the defend-
ants refused to accept the residue of the chairs? If they
had said, 'Make no more for us, for we will have nothing
to do with them,' was not that refusing to accept or
receive them according to the contract? But the learned
counsel for the defendant laid peculiar stress upon the
words" (of the plea) " 'Nor did they prevent or discharge
the plaintiffs from supplying the residue of the chairs
and from the further execution of the contract.' We con-
sider the material part of the allegation which the last
plea traverses, to be, that the defendants refused to
receive the residue of the chairs. But, assuming that
the whole must be proved, we think there is evidence
to show that the defendants did prevent and discharge
the plaintiffs from supplying the residue of the chairs
and from the further execution of the contract. It is
contended that 'prevent' here must mean obstruction by
physical force, and in answer to a question from the
court we were told it would not be a preventing of
delivery of goods if the purchaser were to write in a
letter to the person who ought to supply them, 'Should
you come to my house to deliver them I will blow your
brains out.' But may I not reasonably say that I was
prevented from completing a contract by being desired
not to complete it? Are there no means of preventing
an act from being done except by physical force or brute
violence?" After reviewing and commenting upon cases
cited, it is then held that the plaintiffs were entitled to
a verdict on pleas traversing allegations that they were
ready and willing to perform the contract, that the de-
fendants refused to accept the residue of the goods, and
prevented and discharged the plaintiffs from manufac-
turing and delivering them.

Without further quotation from cases, it seems clear,
both upon principle and by authority, that where one
party to an executory contract refuses to treat it as sub-

sisting and binding upon him, or by his acts and conduct shows that he has renounced it and no longer considers himself bound by it, there is, in legal effect, a prevention of performance by the other party, and it can make no difference whether the contract has been partially performed or the time for performance has not yet arrived ; nor is it important whether the renunciation be by declaration of the party that he will be no longer bound, or by acts and conduct which clearly evince that that determination has been reached and is being acted upon.   It would seem clear, on principle, that a mere declaration of the party of an intention not to be bound, or acts and conduct in repudiation of the contract, will not, of themselves, amount to a breach, so as to create an effectual renunciation of the contract, for one party cannot, by any act or declaration, destroy the binding force and efficacy of the contract. (*Kadish* v. *Young, supra.*)   As said by Bowen, L. J., in *Johnston* v. *Milling*, 16 Q. B. Div. 460 :  "Its real operation appears to be to give the promisee the right of electing either to treat the declaration as *brutum fulmen*, and holding fast to the contract to wait till the time for its performance has arrived, or to act upon it, and treat it as a final assertion by the promisor that he is no longer bound by the contract, and a wrongful renunciation of the contractual relation into which he has entered.   *   *   *   If he does so elect, it becomes a breach of contract, and he can recover upon it as such."

Upon the election to treat the renunciation, whether by declaration or by acts and conduct, as a breach of the contract, the rights of the parties are to be regarded as then culminating, and the contractual relation ceases to exist, except for the purpose of maintaining the action for the recovery of damages.   These views are amply sustained by numerous decided cases.

In *Hochster* v. *De Latour*, 20 L. and Eq. 157, the plaintiff contracted to enter into the service of the defendant as a

courier, and in such capacity attend him in travels about the continent of Europe, the service to begin on June 1, and continue for at least three months, at fixed monthly wages, but before the first of June, although the plaintiff was ready and willing to perform, the defendant renounced the contract and signified his determination to the plaintiff no longer to be bound by it, and the plaintiff, before the time for performance had arrived, brought assumpsit to recover his damages for the breach. It is there said, that "it is surely much more rational and more for the benefit of both parties that after the renunciation of the agreement by the defendant the plaintiff should be at liberty to consider himself absolved from any future performance of it, retaining his right to sue for any damage he has suffered from the breach of it. * * * The man who wrongfully renounces a contract into which he has deliberately entered, cannot justly complain if he is immediately sued for a compensation in damages by the man whom he has injured, and it seems reasonable to allow an option to the injured party either to sue immediately, or to wait till the time when the act was to be done, still holding it as prospectively binding, for the exercise of the option, which may be advantageous to the innocent party and cannot be prejudicial to the wrongdoer." And it was then held that, after the defendant had signified his determination not to be bound by the contract, the plaintiff was entitled to bring his action immediately, and was not obliged to wait until after the day for the performance to begin had arrived.

In *Frost* v. *Knight, supra,* the defendant had promised to marry the plaintiff upon the death of his father. While his father was still living he repudiated the engagement and announced his intention not to fulfill his promise. The plaintiff, without waiting for the death of the father, at once brought her action to recover damage for the breach, and the court there say: "The promisee, if he pleases, may treat the notice of intention as inoperative,

and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of non-performance. But in that case he keeps the contract alive for the benefit of the other party as well as his own. He remains subject to all his own obligations and liabilities under it, and enables the other party not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstance which would justify him in declining to complete it. On the other hand, the promisee may, if he thinks proper, treat the repudiation of the other party as a wrongful putting an end to the contract, and may at once bring his action as on a breach of it; and in such action he will be entitled to such damages as would have arisen from the non-performance of the contract at the appointed time, subject, however, to abatement in respect of any circumstances which may have afforded him the means of mitigating his loss."

The case of *Freeth* v. *Burr, supra,* already quoted from, is an instructive case, and fully sustains *Hochster* v. *De-Latour,* and other cases of like tenor before cited. It is there said that the test of whether there is a renunciation or not is, "whether the acts and conduct of the party evince an intention no longer to be bound by the contract." In *Mersey Steel and Iron Co.* v. *Naylor,* 9 Q. B. Div. 648, Jessel, M. R., re-affirms and approves the doctrine of *Freeth* v. *Burr,* and holds that the question of whether there has been a renunciation of the contract by the defendant is a question of fact, to be determined by the consideration of the nature of the breach and the circumstances under which it occurred. The case, however, went off upon the holding that the circumstances were not sufficient to evince a determination on the part of the defendant to put an end to the contract and to be no longer bound by it. The decision was affirmed by the House of Lords on appeal; Lord Selbourne there say-

ing: "You must look at the actual circumstances of the case in order to see whether the one party to the contract is relieved from its future performance by the conduct of the other. You must examine what that conduct is, so as to see whether it amounts to a renunciation, to an absolute refusal to perform the contract, such as would amount to a rescission if he had the power to rescind, and whether the other party may accept it as a reason for not performing his part; and I think that nothing more is necessary in the present case than to look at the conduct of the parties, and see whether anything of that kind has taken place here." See, also, *Roper* v. *Johnstone,* (L. R.) 8 C. P. 167; *Ex parte Stapleton,* (L. R.) 10 Ch. Div. 586; *Planche* v. *Colburn,* 8 Bing. 14; *Danube and Black Sea Railway Co.* v. *Xenos,* 13 C. B. (N. S.) 825.

The principle seems to have found general recognition by the courts of this country, a few, only, of which need be noticed. In *Masterson* v. *Mayor of Brooklyn,* 7 Hill, 61, the plaintiffs undertook and partially performed their contract with defendants to furnish material, etc., for the construction of the city hall. By order of the defendants the work was indefinitely suspended, and the plaintiffs brought suit to recover damages, including future profits. The principle announced in the English cases before noted is approved. Beardsley, J., there said: "The party who is ready to perform is entitled to full indemnity for the loss of his contract. He should not be made to suffer by the delinquency of the other party, but ought to recover precisely what he would have made by performance. This is as sound in morals as it is in law. * * * The plaintiffs were not bound to wait till the period had elapsed for the complete performance of the agreement, nor to make successive offers of performance, in order to recover all their damages. They might regard the contract as broken up, so far as to absolve them from making further efforts to perform, and give them a right to recover full damages as for a total breach."

The case of *Hosmer.* v. *Wilson* has been already cited.

In *Derby* v. *Johnson, supra,* after holding that by the order of the defendants to discontinue the work the plaintiffs were *prevented* from further performance, it is said : "The plaintiffs might, in addition, in another form of action, have recovered their damages for being prevented from completing the whole work. In making these claims the plaintiffs would be acting upon the contract as still subsisting and binding ; and they might well do so, for it doubtless continued binding on the defendants."

In *Hinckley* v. *Pittsburg Steel Co.* 121 U. S. 264, the defendant agreed to purchase from the plaintiff steel rails, to be drilled as the defendant might direct. The defendant refused to give the directions, and at his instance the rolling of the rails was postponed until after the time of delivery, when the defendant refused to accept any rails under the contract. It was there said : "The defendant contends that the plaintiff should have manufactured the rails and tendered them to the defendant, and, upon his refusal to accept and pay for them, should have sold them in the market at Chicago, and held the defendant responsible for the difference between what they would have brought on such sale and the contract price. But we think no such rule is applicable to this case. This was a contract for the manufacture of an article, and not for the sale of an existing article. By reason of the facts found as to the conduct and action of the defendant, the plaintiff was excused from actually manufacturing the rails, and the rule of damage applicable to the case of the refusal of a purchaser to take an existing article is not applicable to a case like the present."

In *Haines* v. *Tucker*, 50 N. H. 307, the defendants agreed to purchase of the plaintiffs 5000 bushels of malt, and to receive and pay for the same at the rate of 1000 bushels per month. Although plaintiffs were prepared to deliver

the 1000 bushels per month, the defendants called for and received less than 1000 bushels during the first three months. The plaintiffs informed defendants that they were prepared to furnish the malt according to the terms of the contract, and requested them to receive the same at the rate of 1000 bushels per month, which the defendants refused to do. The undelivered malt, not utilized by plaintiffs themselves, was sold on the market, and plaintiffs brought assumpsit against the defendants to recover damages for a breach of the contract, and it was there held, following *Cort* v. *Ambergate Railway Co. supra*, and other cases, that the conduct of the defendants amounted to an unqualified renunciation of the contract, and that after such renunciation it was no longer necessary that the plaintiffs should hold themselves in readiness to perform, or to go to the trouble and expense of offering what had already been refused.

In *Smith* v. *Lewis*, 24 Conn. 624, the doctrine as announced in *Cort* v. *Ambergate Railway Co.* was approved and followed, and again re-affirmed in the same case. (26 Conn. 110.) In these cases the holding was, that under a contract containing mutual and dependent covenants, a refusal on the part of the defendant to perform obviated the necessity of performance, or tender of performance, on the part of the plaintiff, after such refusal. See, also, *United States* v. *Behan, supra; Crabtree* v. *Messersmith*, 19 Iowa, 179 ; *Holloway* v. *Griffith*, 32 id. 409 ; *Dugan* v. *Anderson*, 36 Md. 567 ; *Burtis* v. *Thompson*, 42 N. Y. 246 ; *Howard* v. *Daly*, 61 id. 362 ; *Smoot's case*, 15 Wall. 36 ; *Dingley* v. *Oler*, 117 U. S. 503.

It follows that, upon principle and authority, we are of opinion that instructions 2 and 3, when considered together, as they must be, announced the law to the jury correctly. The objection that the jury were thereby left to determine what were the "substantial provisions of the contract," is, in view of the course of the trial and facts proved, obviated by instructions 7, 12, 13, 16 and 17,

given for appellant. By the seventh, as will be observed, the jury were told, that if the defendant committed breaches, still, if they did not defeat the substantial objects of the contract, or render it unattainable, by proper performance, on the part of Richards, Maynard & Co., then the plaintiff could not recover. By the twelfth they were told that the mere failure or refusal of the defendant to pay the plaintiff or his firm any sum of money demanded and claimed to be due on account of services rendered under the contract, could not ·be construed as an abandonment of the contract by the · defendant, such as would entitle the plaintiff or his firm to maintain the present action. By the sixteenth the jury were told, as a matter of law, that to entitle the plaintiff to recover in this case it was necessary for him to establish, by a preponderance of the evidence, that he and Richards, Maynard & Co. were, by the acts of the defendants, prevented from performing said contract on their part, etc. By the seventeenth they are again told that a failure to pay money due and owing to the plaintiff under the contract was not such an act or omission, in itself, on the part of the defendant, as would prevent the plaintiff fròm completing the contract. And by the thirteenth instruction given on behalf of the defendant the jury were told, that if they believed, from the evidence, that the plaintiff's firm closed their transfer house for the reasons stated in their letter of June 11, 1886, to Mr. Amsden, namely, for refusal to pay their claim of $2592.95, and their account for the month of May, 1886, "and for no other reason," then the plaintiff could not recover and the verdict must be for defendant. So by the eleventh instruction given on behalf of defendant the jury were told, that in determining whether the damages arising from any breach of the contract by the defendant can be ascertained and compensated for, they were not to take into consideration any refusal of the defendant to submit any differences

between it and Richards, Maynard & Co. to arbitration; that the refusal to submit matters in dispute to arbitration was not such a breach of the terms of the contract as to warrant a recovery for such breach.

It seems clear, therefore, under the facts proved, that the question submitted to the jury was, whether the acts and conduct of the defendant showed a fixed determination to be no longer bound by the substantial provisions of the contract upon its part. As already seen, the consideration moving to Richards, Maynard & Co. for entering into the contract was the stipulation, on defendant's behalf, to deliver, to be weighed and transferred through their house, all grain received by it from western roads to be transported east over its lines, that it could control, and that practically the only benefit to be derived by Richards, Maynard & Co. from the contract was by the sale of weights of grain thus transferred. The evidence tended to show that the railroad company had repudiated its liability to perform this part of its contract, and its duty, under the contract, to use the weights derived from plaintiff's firm only in billing the grain to destination, but gave the same away, so as to deprive plaintiff's firm of the profits it would derive by the sale of such weights.

From what has preceded, no extended discussion will be necessary of the point made that there was a variance between the special count of the declaration and proof. It was alleged "that on the 16th day of June, 1886, the defendant abandoned the contract on its part, neglected and refused to perform the same, and refused, without any reasonable or just cause, to be bound by the same," etc. As already shown, the effect of the position taken by and the conduct of appellant was a denial of its obligation to perform the substantial parts of the contract on its part.

In connection with this point it will be proper to notice the contention that in the suit brought June 5,

1886, before referred to, the plaintiff recovered damages for all the breaches of the contract up to the bringing of that suit, and that. therefore, such breaches, being merged in the judgment in that cause, could not subsequently be made the occasion, by Richards, Maynard & Co., for treating the contract as abandoned by appellant. In bringing that suit the plaintiff undoubtedly treated the contract as subsisting, and had not then elected to treat it as abandoned by the defendant and to sue for prospective damages.     The suit was brought, and recovery had for actual breaches to the time of bringing it. We are not required to determine the question thus presented.     If it should be conceded that the plaintiff's claim in bringing that action is inconsistent with his right to show such breaches in this proceeding, it could not affect the result.     Subsequently to the bringing of that action, as already shown, the railroad company refused to recede from its previous position, both in respect of its obligation, under the contract, to deliver cars to Richards, Maynard & Co., and to observe its contract in respect of the use to be made of the weights, and the evidence tends to show that at the time Richards, Maynard & Co. closed their transfer house, appellant was denying its liability under the contract. and evinced a clear intention not to be bound by its provisions.

It is urged, however, that there was here only a partial breach, arising from a difference in the construction of the contract, and that there was at no time a repudiation or renunciation of the contract by appellant,—that it was at all times desirous of keeping it in force and performing it.     These are, as a matter of course, questions of fact, which are conclusively settled by the judgment of the Appellate Court ; but in view of the instructions asked and refused, which sought to take the case from the jury, it may be remarked that the evidence tended to show a repudiation by the railway company of the substantial provisions of the contract, which formed the

consideration for the execution of it by plaintiff's firm. It was not enough, to show that there was no repudiation of the contract obligation by the appellant, to prove that appellant was furnishing some cars to be transferred through plaintiff's transfer house, whereby plaintiff was partially receiving the benefits he claimed under the contract.    The correspondence between the parties, before and after the 5th of June, 1886, shows that appellant was not delivering cars of grain to be transferred through the transfer house because it recognized any obligation on its part to do so, but claimed, and acted on such claim, that it was only bound to deliver such cars as it saw proper.    In other words, it refused to be bound by the provision of the contract requiring it to deliver cars to plaintiff's firm.    Under the construction of the contract upon which it had acted and was proposing to continue to act, it was under no obligation to deliver any cars to be transferred by plaintiff's firm, thus absolutely repudiating its contract liability to do so. True, it had not altogether ceased to deliver some cars to be thus transferred, but they were not delivered because of any contract liability to do it, but at their convenience and option.    Its persistence in this course of conduct had been shown by its repeated refusal to submit the matters in dispute to arbitration, under the contract.    The president of the company wrote, in reply to the demand of plaintiff's firm for arbitration :  "I have to say, that this company having at all times faithfully performed its obligations under said contract, I do not consider there are any matters calling for arbitration," and declining the request for arbitration.    While it is undoubtedly true that refusal to arbitrate would not, under the provisions of this contract, justify the plaintiff in treating the contract as renounced by appellant company, yet such refusal, and the correspondence in respect of the matter, tend to show the persistency with which appellant refused to be bound by the contract.

It is also objected that the court erred in the admission of testimony. First, that appellee was permitted to prove the cost of the transfer house, etc. It is a sufficient answer to say that it does not appear the evidence was objected to.

It is, however, said, that the court erred in refusing to give the fifth instruction for appellant, which was, in effect, that no recovery could be had for the cost or value of the transfer house and its equipments, in this action. This instruction might with propriety have been given, but its refusal was not error. At the beginning of the hearing, before the jury, counsel for the plaintiff stated that he did not attempt to show the breaches for the purpose of recovering for them, but for the purpose of showing, simply, a breach of the contract which entitled the plaintiff to abandon the further performance of it and sue for damages for loss of future profits, when the following colloquy occurred : Mr. Jewett, (for defendant): "In other words, there is nothing but the claim for future profits in this case." Mr. Pence, (for plaintiff) : "That is all there is in this case." Later, and at the close of plaintiff's testimony, the plaintiff sought to show what the transfer house was worth "standing there useless for the purpose for which it had been erected," to which an objection by the defendant was sustained. This all took place in the presence of the jury, and would leave no question in the mind of any intelligent person as to the damages sought and allowed to be recovered. It seems clear that the jury could not have understood that they were to take anything into consideration other than the profits to be derived from the transfer of grain under the contract, and they were, in effect, so told by the fourth instruction given at the instance of plaintiff.

On the trial of the cause certain letters written, one by Mr. Blodgett and one by Mr. Clark, commendatory of plaintiff's method of transferring grain, etc., were offered and read in evidence, over the objection of de-

fendant. That these letters were incompetent scarcely admits of question, and it is difficult to perceive upon what principle they were admitted. That the error was a harmless one is equally apparent. It was not controverted that the Richards method, so called, accomplished the purpose, nor was there any pretense that it was a failure, so that the plaintiffs did not perform their contract.

Other points are made in argument, which, in view of the length of this opinion, seemingly made necessary by the very ingenious and able argument of the learned counsel, it must suffice to say have been carefully considered and are not deemed of such gravity as to warrant further discussion.

Finding no prejudicial error in this record, the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*