GEORGE T. VICKERS, DEFENDANT IN ERROR, v. ELECTRO-ZONE COMMERCIAL COMPANY, PLAINTIFF IN ERROR.

Argued March 12, 1902—Decided June 16, 1902.

1. The owners and vendors of a patented mixture, by an agreement, under seal, with their vendees, sold to the latter, at fixed prices, certain quantities of the mixtures, which the latter were to order, accept and pay for within a year from the date of the agreement, and by the same instrument granted to the latter the sole right to sell and distribute the goods within the territory of the United States. In consideration of this territorial monopoly of business, the vendees expressly covenanted to purchase and pay the vendors, during the time named, for the specified quantities of the merchandise so to be ordered. By a conditional stipulation in a subsequent (the fifth) clause of the instrument, it was provided that if the vendees should fail to order and purchase from the vendors and pay for, during said period, the stipulated quantity of the compound, that the agreement should thereupon, *ipso facto*, and without the necessity of any action by the vendors, become void, and all rights and interests thereunder of the vendees should be immediately forfeited. *Held*, that the terms of the agreement are free from ambiguity, and that the right of the vendors to sue and recover from the vendees damages at law for their failure to order and purchase the designated merchandise within the year named, is not defeated or affected by the conditional stipulation in question.

2. A party injured by the repudiation of a contract by the other parties bound to perform it, has an election of remedies he may pursue, one of which is that he may treat the repudiation as putting an end to the contract for all purposes of performance and

sue for the profits he would have realized if he had not been prevented from performing, and the contract would be continued in force for that purpose.

3. If a party to a sealed agreement distinctly covenants therein to perform some particular act or duty constituting a principal inducement to the executed contract, a subsequent stipulation therein contradicting such prior covenant will be rejected for repugnancy.

4. If clauses in a writing are repugnant and incompatible, the earlier prevails in deeds and other instruments, *inter vivos*, if the inconsistency be not so great as to avoid the instrument for uncertainty.

5. Even if the intent of the parties upon considering the whole contract, has been left in some doubt, yet the legal operation of the terms as used in the instrument, renders it voidable at the election of the vendors only, and the vendees are not permitted to take advantage of their own wrong in failing or refusing to comply.

On error to the Supreme Court. The opinion of that court is reported in 37 *Vroom* 9.

Action of George T. Vickers against the Electrozone Commercial Company for damages for breach of contract for failure to purchase certain drugs for the first year covered by the contract. Defendant demurs to plaintiff's declaration, and craves oyer of the sealed agreement and assumption upon which the suit is founded, the material portions of which read as follows, viz.:

"Agreement made and entered into this 24th day of September, 1897, between the Electrozone Company, a corporation created and existing by and under the laws of the State of New York, party of the first part, and William A. Mears, of Philadelphia, Pa., and William H. Hibbard, of Buffalo, N. Y., parties of the second part, and Albert E. Woolf, of the city of New York, party of the third part, for the good and valuable consideration hereinafter expressed; witnesseth:

"*First.* The party of the first part hereby grants, bargains and sells to the parties of the second part the sole right, except as herein reserved to the party of the first part, to sell and distribute, within the territory of the United States, and not elsewhere, the disinfectants and antiseptics manufactured

by the party of the first part under United States patent number 490,797, and trade-marks numbers 28,189 and 27,136, and under a secret process, and now known as 'Electrozone' and 'Meditrina.'

"*Second.* And the party of the first part hereby agrees, subject to the limitations hereinafter expressed, to sell and deliver to the parties of the second part, F. O. B. at the city of New York, such quantity or quantities of 'Electrozone' and 'Meditrina' as the parties of the second part may from time to time order. Such 'Electrozone' shall be delivered in bottles containing thirty-two ounces each, and such 'Meditrina' in bottles containing eight ounces each, unless the parties of the first and second parts shall hereafter agree to change the size of said bottles.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"*Third.* The said parties of the second part shall pay to the party of the first part for such 'Electrozone,' 'Meditrina' and crude 'Electrozone,' as shall be furnished to it by the party of the first part as aforesaid, upon delivery thereof as follows, namely: For bottled 'Electrozone' and for bottled 'Meditrina,' twenty dollars per gross of bottles, and for crude 'Electrozone,' twenty cents per gallon.

"*Fourth.* The parties of the second part hereby agree to order, accept and pay for, at the price hereinbefore specified, not less than the following quantities of 'Electrozone' or 'Meditrina,' or both, during each of the following periods, to wit:

"1st. During the first year, from and after the date of this agreement, not less than 1,000 gross of bottles of 'Electrozone' or 'Meditrina,' or both.

"2d. During the second year, from and after the date hereof, not less than 2,000 gross of bottles of 'Electrozone' or 'Meditrina,' or both. And the same quantity in each year following said second year. In case the size of the bottles hereinbefore specified, or the prices thereof, shall be changed by agreement of the parties hereto, the amount of said 'Electrozone' and 'Meditrina' to be ordered and paid for by the

parties of the second part during each of the periods last aforesaid, shall be such as to produce the same amount as if such sizes or prices had not been changed.

"*Fifth.* If the parties of the second part shall fail to order and purchase from the party of the first part and pay for, during any one of the aforesaid periods, the amount of 'Electrozone' or 'Meditrina' in the last aforesaid article of this agreement provided to be ordered, purchased and paid for during said period, this agreement shall thereupon, *ipso facto,* and without any notice, action or proceedings on the part of the party of the first part, become null and void, and all rights and interests thereunder of the parties of the second part shall be immediately forfeited to the same extent as if this agreement had never been made.

"*Sixth.* All goods ordered by the parties of the second part under this agreement shall be delivered as hereinbefore specified by the party of the first part, within thirty days after the receipt by it of such orders; but it is expressly understood and agreed that if at any time the unfilled orders of the parties of the second part shall exceed the capacity of the plant and apparatus of the party of the first part, so that said party of the first part cannot with due diligence fill said orders within the thirty days aforesaid, then and in that case the party of the first part shall have the right to notify said parties of the second part to that effect, and shall have thirty days' further time from the time of such notice in which to increase the capacity of its plant sufficiently to fill said orders.

"*Seventh.* If the parties of the second part shall have complied with all the conditions of this agreement to be by them performed, and the party of the first part shall neglect or refuse to fill the orders of the parties of the second part under this agreement, then and in that case the parties of the second part shall have the right to manufacture said 'Electrozone,' 'Meditrina' and crude 'Electrozone' at its own cost and expense, and to sell the same under the United States patent and trade-marks hereinbefore referred to, and pursuant to the secret process hereinafter referred to, until such time as the

parties of the first part shall be able and willing to fill such orders. In case said parties of the second part shall so manufacture and sell at their own cost and expense, the party of the first part, upon being again ready and willing to fill the orders of the parties of the second part, shall reimburse said parties of the second part for all outlay and expense directly made by them in filling said orders on their own account; provided, however, and this provision of this contract is upon the express condition and understanding that the parties of the second part shall not have such right to manufacture hereunder for failure of the party of the first part to deliver as aforesaid, in case such failure is caused by act of God or the public enemy, or by a strike, or the destruction or injury from any cause of its machinery and equipment, or by the failure of the party of the first part to obtain the necessary bottles, after using due diligence to obtain the same.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"*Eleventh.* Said 'Electrozone,' 'Meditrina' or crude 'Electrozone' shall not be sold during the period of one year from the date hereof, by the parties of the second part, at less price than at present sold by the party of the first part, unless by consent of the parties of the first part. This agreement shall be binding upon the successors and assigns of the parties hereto."

Assignment and assumption in these words, viz.:

"William A. Mears and William H. Hibbard hereby assign all their right, title and interest in and to the foregoing agreement to the Electrozone Commercial Company, and said Electrozone Commercial Company hereby accepts such agreement, and the Electrozone Company hereby ratifies and confirms such assignment and acceptance.

"Dated September 24, 1897."

For the plaintiff in error, *S. Stanger Iszard.*

For the defendant in error, *Corbin & Corbin.*

The opinion of the court was delivered by

VREDENBURGH, J.   The counsel of the plaintiff in error, insisting, correctly, that his demurrer craving oyer of the agreement upon which the declaration is founded, and its introduction in full into the record, is the same in effect as if the whole instrument had been stated in the declaration, and draws its entire terms in review, urges that when all its provisions are examined it is "free from ambiguity," and that the admitted failure of the parties of the second part (represented by him) to order and pay for the designated merchandise does not constitute an actionable breach of the agreement. That this agreement is free from ambiguity will be conceded, but it seems to me to be equally clear its proper interpretation will demonstrate that the failure of the plaintiffs in error to order the goods contracted for constituted an actionable breach of the agreement.

For the sake of clearness in dealing with this assigned, tripartite instrument, it should be borne in mind that, by force of its several transfers, set forth in the declaration, the plaintiff below (Vickers) represents the first parties to the bargain, called the "Electrozone Company," who were the vendors, and that, by virtue of the "assumption" or "acceptance," the defendants below ("The Electrozone Commercial Company") take the place of the second parties to the compact, the vendees, called therein "Mears" and "Hibbard." The substance of that agreement can be summarized as follows: The first parties, who were the sole owners of certain patented liquid compounds or disinfectants called "Electrozone" and "Meditrina," on their part, sold to the second parties, at prices therein fixed, certain quantities of these patented mixtures, and, by the same instrument, granted to them the exclusive right to sell and distribute them within the territory of the United States. This right was granted to the second parties subject to the restriction that the patented compounds should not be sold by them at prices less than those at which it was then sold by the first parties, except by their consent. The second parties, on the other hand, agreed, in consideration of

this territorial monopoly of business so granted them, to order and accept from the first parties and pay to them specified prices for a quantity of not less than one thousand gross of the bottled compounds within a year from the date of the agreement. The agreement regulated the place and manner of the delivery of the goods, the sizes of the bottles, the form in which they might be transmitted to the vendees, and other details not now important to be noticed. So far as considered, the intent of the parties to the agreement cannot be misunderstood. The averments of the count in the declaration demurred to, reduced to their simplest elements, are tantamount to the charge that the vendees agreed to pay the vendors certain prices for certain quantities of goods, sold by the latter to the former, which were ready for delivery, but which the vendees had failed and refused to accept and pay for, with a resultant damage to the vendors to the extent of the first year's profits they would otherwise have realized from the transaction. A party injured by the repudiation of a contract by the other party also bound by it has an election of remedies he may pursue, one of which is that he may treat the repudiation as putting an end to the contract for all purposes of performance, and sue for the profits he would have realized if he had not been prevented from performing, and the contract would be continued in force for that purpose. *Hopk. Sel. Cas. Cont.* 578; *Lake Shore Railroad Co.* v. *Richards,* 152 *Ill.* 59; *Ryan* v. *Remmey,* 28 *Vroom* 474; *Kehoe* v. *Rutherford,* 27 *Id.* 23.

The legal sufficiency of these averments, so standing, the plaintiffs in error cannot, and do not, dispute, but they insist in this court that these averments are not supported by the terms of the instrument declared upon when considered in all its parts and as an entirety; that "it contains within itself express provisions for its own discharge—the non-fulfillment of a specified term of the contract," and that the remedy provided for in case of default in the purchase of the goods by the vendees was "exclusive of any remedy at law against them; that the vendors 'got rid' of the contract with the vendees, and would have the untrammelled use of their products

to sell themselves or find other contractors." An examination of the whole agreement will show that the only clause in it which furnishes the slightest basis for this contention is the fifth. Under the third and fourth clauses the vendees had distinctly covenanted, for the space of one year, to order from the vendors, and to accept and pay for, one thousand gross of bottles of this compound, at the price of $20 per gross. What is there in the fifth clause that can be properly construed as evincing an intention of the vendors to resort to it as their exclusive remedy for default of the vendees, or to surrender or waive the benefit to themselves (the vendors) of the prior covenants for the purchase of the goods and the payment of money to them? That clause, in substance, provides that if the second parties (vendees) shall fail to order and purchase from the first party (vendors), and pay for during said period, the stipulated quantity of the compounds, that the agreement shall thereupon, *ipso facto,* and without the necessity of any action by the vendors, became void. But with what consequences? These consequences are, in the same sentence, expressed to be that all rights and interests thereunder of the vendees (not the vendors) shall be immediately forfeited. It is to be especially observed that the language of this clause does not reach or affect either the rights of the vendors or the liabilities of the vendees under this agreement.

The liabilities of the latter are quite distinguished from their rights. Those rights are regarded, under this fifth clause, as resting within their own volition, and as belonging to themselves, but their *obligations* under the contract which belonged to others are, properly, not made the subjects of their own voluntary actions. That the fifth clause was intended, in a measure, as self-protective to the vendors against non-performance by the vendees, and as additional, and not substitutional, to their remedy at law, receives support from the language of the seventh clause, which, *vice versa* to the fifth, affords some self-protection to the vendees, in case of their compliance with the conditions of this agreement, should the vendors, on their part, fail to comply. In the last event, the vendees are given the right to manufacture, for their use,

the designated mixtures, at their own cost, and to sell the
same until such time as the vendors should "be able and
willing to fill such orders." Thus the mutual and reciprocal
rights and obligations of these two contracting parties, as
against each other, were, under this carefully-framed agree-
ment, intended to be safeguarded and fortified through stipu-
lations which were self-enforceable; but there is no expression
indicative of an intent to make these reciprocal.remedies ex-
clusive of the legal remedy, or to waive the rights at law for
breach of the contract of either party against the other. An
intent to incorporate in this paper such a waiver should have
been expressed in clear and .explicit terms.

The·effect of this contention of the plaintiffs in error, re-
garded from a practical standpoint, results in a *reductio ad
absurdum*. Is it, in the least degree, probable that these ven-
dors, who were owners of a valuable monopoly and presumably
men of affairs, after framing carefully an important sealed
instrument, the principal inducement to which must have been
the acquisition of substantial profits for themselves out of a
business to be carried on in a large territory for an ensuing
year of time, and, after stripping themselves of that privilege,
would, designedly, by the same instrument, put it in the power
of their vendees, during all that period, at will, to defeat the
whole object of the compact and escape all liability therefor?
If the plaintiffs in error are correct in their construction
of the contract, the vendors have adopted a very ingenious
method of strangling their patented novelty in its infancy.
They have not only enabled others—probably their competitors
in business—to consign the enterprise to business oblivion for
at least a year, but they have also most effectually 'estopped
themselves, during the same period, from either earning any
profits by their own exertions, or from reaping any benefits
through the labors of their vendees. Such business folly, not
to say stupidity, will not readily be inferred· to have been
within the intention of the vendors. The insistment that the
fifth clause furnished the *exclusive* remedy, in case of default
in the purchase, is unreasonable, and is certainly not sus-
tained by the express language of that clause, nor is there

to be found, in the expressions used in any part of the agreement, any warrant for importing such a meaning into it. Such an interpretation would create a limitation of the liability of the vendees to purchase, in direct conflict with their previous clear and explicit covenants, and should be held void for repugnancy. It will be observed that the construction attempted to be placed upon the proviso of the fifth clause reading "if the parties of the second part shall fail to order and purchase," &c., is that such proviso is inconsistent with *any personal liability whatever* of the defendants below upon their previous covenants to order and pay for the merchandise stipulated for. They thus put themselves within the clear operation of the rule laid down in the well-known case of *Furnivall* v. *Coombes, 5 Man. & G.* 736. As was said by Mr. Justice Cresswell, in that case, in giving judgment on demurrer for the plaintiffs against the defendants, "the defendants first enter into a clear personal covenant, and then they endeavor, by the proviso, to relieve themselves from all personal liability." Chief Justice Tindal, in the same case, said: "The question is whether, taking the covenant and proviso together, the plaintiff has any cause of action," and (after reading the proviso) added, "Therefore, if the defendants have entered into a covenant which, to any extent, binds them personally, this proviso is at variance with such covenant, and consequently must be rejected as repugnant according to the authorities cited." 1 *Ad. Cont.* (*ed.* 1888) 297, states the principle thus: "If a man covenants, in his own name, for the performance of some particular act or duty, and then seeks, by proviso, to relieve himself from *all liability* upon the covenant, the proviso will be rejected as being repugnant to the covenant." It is not necessary to refer to the authorities cited in Furnivall *v.* Coombs. That case has been approved in this court in some of its bearings, although not upon the precise points here involved (see *Dayton* v. *Warne,* 14 *Vroom* 659), and also in the Supreme Court. See *Booth* v. *Wonderly, 7 Id.* 250, 255. But if there be any merit in the contention that the fifth clause should be construed as showing an intention that the second parties were to be exempt

from liability at law for breach of the prior third and fourth covenants of this sealed instrument, the question should be controlled by, and falls within, the operation of the well-settled doctrine, thus stated in 2 *Pars. Cont.* (*ed.* 1860) 26, and *Id.* (*ed.* 1873) *513: "So, it is a general proposition that where clauses are repugnant and incompatible, the *earlier* prevails in deeds and other instruments *inter vivos,* if the inconsistency be not so great as to avoid the instrument for uncertainty."

The "inconsistency" in the case in hand (if, indeed, there be any) cannot be claimed to be so great as to avoid the instrument for uncertainty, for the reasons previously pointed out. The proper effect of the fifth clause was to afford the vendors additional protection against default by the vendees, not at all incompatible with the retention of their right to seek damages at law for such default.

Among the cases referred to in the text, in support of this principle, is *Hardman* v. *Hardman, Cro. Eliz.* 886. This case was debt upon a bill obligatory, reading "Memorandum that I, John Hardman, * * * do acknowledge myself to owe and do promise to pay to my mother, Agnes Hardman, the sum of £10, * * * for the payment whereof I bind myself, my heirs, executors and administrators, to John Hardman, the elder, my father." Upon demurrer by defendant, it was "adjudged to the plaintiff, and that it was a good bill to Agnes, by the words in the first part of the bill, and the words which oblige him to John Hardman, Sr., in the last part of the bill, are void." In a note it is said: "The last clause was rejected because repugnant to the complete obligation already contracted."

*Story Cont.,* § 660, states the rule as to repugnant clauses in contracts in another form, not dependent upon the mere order of precedence in which they are framed in the instrument, thus: "But whenever one portion of a contract is wholly repugnant to the rest of it, and is irreconcilable with the manifest intention of the parties, as apparent upon a consideration of the whole instrument, it will be stricken out." Again, in section 661, in speaking of the effect of contra-

dictory stipulations occurring in contracts, he says: "If the subsequent stipulation contradict and restrict what was distinctly stated, and *constituted a principal inducement* to the contract, it will be of no effect."

There can be no doubt but that the principal inducement to the contract we are considering was the purchase and payment for the patented mixtures, and therefore the case falls clearly within the meaning of the above statement of the law. *Clark Cont.* (*ed.* 1894) 589, *ch.* 10, in giving the subsidiary rules of construction which govern the interpretation of contracts, mentions two which are of some pertinence. He says: "A contract will, if possible, be construed so as to render it reasonable, rather than unreasonable," and "where it is susceptible of two meanings, will be given the meaning which will render it valid."

The construction given by the Supreme Court, in the opinion filed below, to the proviso of the fifth clause, to the effect that it constituted a grant of an option, in favor of the vendors only, to treat the agreement as voidable, has not seemed to need comment, for the reason that, considering the whole contract, there is discoverable no ground for the insistment, now urged before this court, that it exhibits an intent of the parties to exempt the vendees from liability at law for breach of their covenants to purchase. If, however, the absence of such an intent is not entirely clear, the cases, relied upon in the Supreme Court, of *Doe* v. *Bancks,* 4 *Barn. & Ald.* 401, and *Rede* v. *Farr,* 6 *Mau. & Sel.* 121, 124, and others there referred to (see, also, *Smith* v. *Miller,* 20 *Vroom* 521, and *Creveling* v. *West End Iron Co.,* 22 *Id.* 34), furnish pointed and convincing authority for the principle, then applicable, and sustained by the opinion below, that the legal operation of such a proviso rendered the instrument voidable at the election only of the vendors, and the vendees should not be permitted to take advantage of their own wrong by failing or refusing to comply.

The question of the plaintiff's right to recover damages for the failure of the defendants to comply with the agree-

ment beyond the first year therein named is not before us, and no opinion is intended to be expressed in regard thereto.

No other grounds of error deserving discussion are presented to this court, nor disclosed by the record, and the judgment of the Supreme Court should be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, VAN SYCKEL, GARRISON, COLLINS, FORT, GARRETSON, HENDRICKSON, PITNEY, BOGERT, KRUEGER, ADAMS, VREDENBURGH, VOORHEES, VROOM. 15.

*For reversal*—None.