instruction as to the use of said tools, in giving them improper instructions, in exposing them to danger of explosion without warning them thereof."

The action was brought in the summer of 1900, and was first tried in 1902. A verdict was then rendered in favor of the plaintiff, but the judgment entered thereon was reversed by this court. Purcell v. Hoffman House, 97 App. Div. 307, 89 N. Y. Supp. 975. The case was again brought on for trial in December, 1906. During the progress of the second trial, the plaintiff's counsel, while arguing the question as to the instructions which were given to his client at the time he was injured, was met by an objection from the court that the giving of improper instructions or the lack of proper instructions was not sufficiently pleaded in the complaint and that the evidence as to the same would be excluded. The plaintiff's counsel thereupon applied for permission to withdraw a juror in order to have an opportunity to apply at Special Term for leave to amend, which was granted, the plaintiff being ordered to pay $30 trial fee; and more than a year afterwards the application was made at Special Term for leave to serve the amended complaint, which resulted in the order now under review, and which order was granted permitting the amendment desired on the payment of $10 costs only. The limitation of the costs at Special Term was based on the assumption that the theory of the first trial and appeal was that the plaintiff's assertion of negligence included the absence of proper and adequate instructions; but I do not think the plaintiff is at liberty to urge that view, inasmuch as he acquiesced in the ruling of the court on the second trial, and must be assumed to desire the amendment as a necessary safeguard and precaution before proceeding to the third trial. The rule is well settled that in the circumstances disclosed by the record herein the court may not amend a complaint after trial and appeal without imposing upon the applicant as a condition the payment of the costs and disbursements of the action to the date of the granting of the relief sought. See authorities cited in the opinion in Audley v. Townsend (decided by this court March 5, 1909) 115 N. Y. Supp. 145.

The order, in so far as appealed from, should be modified, by requiring as a condition of the amendment that the plaintiff pay to the defendant all the costs and disbursements of the action to the date of the order and $10 costs of the motion, less the $30 trial fee heretofore imposed, if the same has been paid, and, as modified, affirmed, with $10 costs and disbursements. All concur.

---

CALLANAN v. KEESEVILLE, A. C. & L. C. R. CO. et al.

(Supreme Court, Appellate Division, Third Department.   March 10, 1909.)

1. CANCELLATION OF INSTRUMENTS (§ 3*)—CONTRACT—RIGHT TO CANCELLATION.
   That a contract was not sufficiently definite so that specific performance could not be decreed, or that damages for its breach could be measured and recovered, was no ground for the refusal of equity to cancel the con-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tract because of the refusal of one of the parties to perform one of its substantial requirements.

[Ed. Note.—For other cases, see Cancellation of Instruments, Dec. Dig. § 3.*]

2. CORPORATIONS (§ 423*)—AUTHORITY OF AGENT.

It cannot be held that an agent of the directors of a corporation, employed to prepare a contract, could bind them by any arrangement with the other party, the purpose of which was to deceive the directors concerning the obligations of the contract.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 423.*]

3. RAILROADS (§ 127*)—TRANSFER—CONTRACT—CONSTRUCTION.

Where the directors of a railroad company agreed to transfer all its stock to defendants in consideration of their agreement to electrify the line and build a certain extension, and the provision relating to the extension was so worded as to be susceptible of more than one construction, it would be construed in the sense that defendants knew the directors understood it, to create an absolute obligation on defendants' part to build the extension.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 127.*]

4. RAILROADS (§ 127*)—TRANSFER—CONTRACT—CONSTRUCTION.

The directors of a railroad signed a contract agreeing to transfer to defendants all its capital stock and to issue for their benefit certain bonds in consideration of defendants' agreement to electrify the road, provide certain dock facilities, extend the road on both sides of a river to K., etc. The contract provided that the contractors should commence the work of reconstruction at once and complete the same as rapidly as possible, and closed with a paragraph that the contract was made on the mutual understanding that the railroad was to be extended to a lake "as soon as practicable, work to be begun within not longer than three years." *Held*, that the contractors thereby absolutely bound themselves to extend the road to the lake.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 127.*]

5. CANCELLATION OF INSTRUMENTS (§ 3*)—CONTRACTS—BREACH.

Where defendants repudiated any obligation to extend a railroad to a certain point pursuant to a contract, requiring them to commence such extension within three years, such repudiation constituted a breach of the contract for which a rescission was authorized, though the time within which the extension was to be begun had not expired.

[Ed. Note.—For other cases, see Cancellation of Instruments, Dec. Dig. § 3.*]

6. PLEDGES (§ 50*) — RIGHTS OF PLEDGEE — RAILROAD BONDS — BONA FIDE HOLDER.

Where there was no sufficient proof of mala fides on the part of a pledgee of railroad bonds which had been received from contractors after suit had been instituted to rescind the contract under which the contractors acquired whatever rights they had to the bonds, a surrender thereof to the corporation could only be compelled on payment to the pledgee of the amount for which the bonds were originally loaned.

[Ed. Note.—For other cases, see Pledges, Dec. Dig. § 50.*]

7. CANCELLATION OF INSTRUMENTS (§ 59*)—CONTRACTS—RELIEF—COMPENSATION FOR EXPENDITURES.

Where a railroad company was entitled to the rescission of a contract for the transfer of its stock, etc., to defendants in consideration of their electrifying and extending the line, etc., because of defendants' failure to perform, the court, on decreeing a rescission, should place the parties in statu quo by allowing defendants for expenditures necessarily and reasonably made in the execution of the contract up to the date of the judgment,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

less the moneys received by them from the railroad and from the sale of the railroad's bonds.

[Ed. Note.—For other cases, see Cancellation of Instruments, Dec. Dig. § 59.*]

Kellogg and Chester, JJ., dissenting.

Appeal from Judgment on Report of Referee.

Action by Michael Callanan, suing individually and in behalf of the other stockholders of defendant railroad company, similarly situated, against the Keeseville, Ausable Chasm & Lake Champlain Railroad Company and others. From a judgment on a referee's report in favor of plaintiff, defendants appeal. Modified and affirmed.

The action is one to rescind a contract made between the Keeseville, Ausable Chasm & Lake Champlain Railroad Company and Joseph A. Powers and Walter H. Mansfield as contractors. The contract is as follows:

"Exhibit A.

"Agreement made this 10th day of June, 1903, between the Keeseville, Ausable Chasm and Lake Champlain Railroad Co., hereinafter called the 'Company,' and Joseph A. Powers and Walter H. Mansfield, hereinafter called the 'Contractors,' in consideration of one dollar hereby receipted for mutually and other good consideration.

"Witnesseth: The company agrees to transfer to the contractors and deliver the same within ten days after the completion of the agreement hereinafter mentioned on their part for the operation of the road by electricity, seventy-five per cent. of the issued capital stock of said company, and to at once place the same in escrow, with the Keeseville National Bank for said purpose; and agrees to deliver to said contractors all the unissued capital stock of said company, and agrees to appoint an executive committee of three to be named by the said contractors and with powers satisfactory to them. The company agrees to mortgage its property, franchises and equipments by executing and filing a consolidated mortgage in the sum of $175,000, the bonds to be issued thereunder to be six per cent. twenty-year gold bonds, with interest payable semi-annually on July 1st and January 1st. Said bonds to be callable and payable at ten per cent. premium and accrued interest at any time. Sufficient of said bonds to be held in escrow to retire the present outstanding bonds of the company and the balance of said bonds to be issued to said contractors for the work and material hereinafter specified, as soon as practicable, and procure the necessary consents of stockholders thereto.

"The contractors agree to reconstruct the company's railroad into a first-class modern third rail electric railroad, to furnish an electric locomotive of sufficient capacity for the company's business and storage battery, dynamo, switchboard and appurtenances sufficient for the company's use and business; and to furnish sufficient and proper cars for the business of the company. Said contractors agree to purchase and deliver to the company the dock property at Port Kent on Lake Champlain, and to connect the company's railroad therewith by suitable tracks; also to extend the company's railroad westerly on both sides of the Ausable river to the upper bridge in the village of Keeseville as soon as possible.

"Said railroad when reconstructed shall at all times be operated with as good service to the villages of Keeseville and Ausable Chasm as heretofore had and there shall be no increase of rate for freight or passengers.

"The company is to procure an exclusive contract for traffic from and to the Ausable Chasm, from the Ausable Chasm Co. if possible.

"The company is to procure and the contractors pay for proper water power to operate said electric road, at a price mutually agreed upon.

"The contractors agree to commence the said work of reconstruction at once and carry the same to completion as rapidly as possible, and both parties are to use their best endeavors to accomplish the same.

"This contract is made upon the mutual understanding that said electric

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

railroad is to be extended through the Ausable Valley to Lake Placid as soon as practicable and work to be begun within not longer than three years."

This road was at this time a steam railroad about six miles in length, running from Keeseville to Port Kent, a station on the Delaware & Hudson Railroad. It was organized by the business men and citizens of Keeseville in 1889, and was mostly run by the stockholders and directors in person. The company was capitalized to the amount of $60,000; 6,000 shares of $10 each, of which 3,071 shares had been issued, and 2,929 shares remained in the treasury at the time of the execution of the contract. It was also bonded to the amount of $30,000. Immediately after the execution of the contract Powers and Mansfield entered upon its performance. They purchased the dock property at Port Kent for the sum of $7,000, and conveyed it to the railroad company in June, 1903. During the summer of 1903 they purchased coverings required for the protection of the third rail, and also the poles that were required in the electrification of the road. This action was begun in March, 1905. At that time no substantial effort had been made to extend the road to Lake Placid, and no substantial progress in transforming of the road into an electric road. The reasons will be discussed in the opinion. After the action was commenced, the contractors proceeded in transforming the road into an electric road, so that at the time of the judgment such transformation had been very nearly completed.

The referee has directed a rescission of the contract upon various grounds, one of which was that the defendants had made no attempt in good faith to extend the road to Lake Placid, nor had they entered into the contract in good faith with the intention to construct that extension; another, that the contractors had unreasonably neglected and delayed to transform the road into an electric road as provided by the contract. The judgment directed was for a rescission of the contract, without allowance for moneys spent in the transformation of the road after the commencement of the action. Further facts will appear in the opinion.

Argued before SMITH, P. J., and CHESTER, KELLOGG, COCHRANE, and SEWELL, JJ.

Thomas O'Connor, Francis A. Martin, and Van Santvoord & Wellington (D. Cady Herrick, of counsel), for appellants.

Woods, Conway & Cotter (Thomas E. Conway and Frank E. Smith, of counsel), for respondent.

SMITH, P. J. The facts in this case are so complicated that it is impossible in an opinion of reasonable length to set them forth fully. We are indebted to the counsel, both for the appellants and respondent, for a concise and admirable analysis of the facts presented in their briefs. Those facts only will be here discussed which seem to us controlling of the issues which we are required here to determine.

The plaintiff is now a large stockholder in the road, and was one of the directors at the time this contract was made. This action is brought in his behalf and in behalf of all others similarly situated. It is brought for the corporation upon the ground that the corporation itself is now under the control of directors named by these defendant contractors, and therefore disqualified from protecting the interest of the corporation as against the contractors. At the beginning of the trial it was stipulated:

"That the cause of action which plaintiff seeks to enforce, and the relief he seeks to obtain, are such as the corporation might have enforced and obtained on its own behalf and for its own benefit, had it chosen so to do."

The most prominent issue raised before the referee was as to the provision in the contract in reference to the extension of this road to Lake Placid. The claim of the plaintiff is that this provision constitutes an obligation binding upon the contractors to so extend the road and to commence work within three years. While the three years had not elapsed at the time of the commencement of the action, they claim that the contractors have denied any obligation in reference thereto under the contract, and have openly asserted that they did not intend to build such a road. These facts they claim authorize a rescission of the contract at this time, with such restoration of the status quo as is, under all the circumstances, possible. The contention of the defendants, on the other hand, is that this provision of the contract has no binding force, that it was not inserted as a substantive part thereof, and that it is only an expression of a hope or perhaps an expectation that such an extension can be made within the three years named in the contract. The referee has found with the plaintiff, has given force to this provision of the contract as an imperative obligation, has found that the defendants entered into the contract without any intention to comply therewith, and for this, as one of the grounds, has decreed a rescission.

Upon the face of the contract, unaided by extraneous circumstances, we are of opinion that an obligation is therein assumed by the defendant contractors in relation to this extension. The other provisions of the contract all have reference to the transformation of the road into an electric road, and for a short extension upon the one end to the dock at Port Kent, upon the other end to the upper bridge in the village of Keeseville. The transfer to the contractors of the stock of the road and of the bonds are for this purpose only. No provision is made for financing any extension to Lake Placid, which extension would cost, as appears in the evidence, upwards of $1,000,000. All other obligations assumed by the contract are assumed in express terms of agreement, while the provision relating to the Lake Placid extension is stated only as an understanding. But the writing stating the understanding of the parties as to its acts thereafter to be done contains prima facie an agreement to do those acts. Jones v. Kent, 80 N. Y. 585. If such expression be here of doubtful interpretation, by reason of its relation in the paper writing to other express agreements, that doubt would seem to be dispelled by the specific provision that the work was to be begun "within not longer than three years." The expression of a mere hope or expectation is not usually qualified by an imperative limitation as to the time in which the act is to be done. The different phraseology in this part of the writing might easily be accounted for by the fact that Powers and Mansfield were not contracting themselves to perform the work, as is the nature of the other agreements made by them in the contract. In fact, it is doubtful if the contract is sufficiently definite so that a court of equity could enforce it specifically, or that damages for its breach could be measured and recovered. The dominant purpose, however, of these owners and directors of this road was confessedly to procure this extension. However incomplete this part of the contract may be, it con-

tains at least a stipulation on the part of these contractors to ac-
complish, if possible, this extension through the railroad which they
control. This effort they have agreed to make in good faith, and the
very fact that a breach of the defendants' agreement possibly cannot
be measured in damages is all the more reason why the plaintiff should
be protected by a court of equity, either in obtaining a conscientious
fulfillment of the defendants' obligations, or a rescission of the con-
tract for the willful breach thereof. This little road of six or eight
miles is a necessary part of an extended road to Lake Placid. In the
hands of the defendant contractors repudiating both legal and moral
obligations to make the extension, the plaintiff, and those whom he
represents, are forever blocked in accomplishing what was their primal
purpose in making this contract with the defendants. It would seem
strange, indeed, if equity be powerless to give relief. Moreover, the
traffic from Lake Placid is a material part of the patronage which
this railroad needs, and it is a matter, therefore, of moment to the
railroad itself, as well as to the directors of the road and residents
of the village of Keeseville.

If this provision of the contract be read in connection with attendant
circumstances, the defendants' obligation thereunder is not less clear.
Efforts had been made to transfer the road to the Delaware & Hud-
son, but upon the express condition that the road would be extended
to Lake Placid. To this condition the Delaware & Hudson refused
to accede, and for that reason negotiations were abandoned. There-
after a proposition was made to these defendant contractors to give
to them the stock of the road, on condition that the road be extended
to Lake Placid. This proposition was at first refused. Thereafter
negotiations were taken up, and the defendant contractors submitted a
form of contract which contained no provision as to the extension to
Lake Placid. This contract the directors refused to sign until this
provision was inserted. The defendants contend that the provision
was allowed to remain in the contract that was signed upon the as-
surance that it was not binding, but was simply inserted for the pur-
pose of misleading somebody. It will be borne in mind that both
upon the trial and upon this appeal the defendants' counsel assert that
this provision of the contract has no binding force. The testimony
of the defendants themselves as to the reason for the insertion of
this provision is both interesting and instructive. Mr. Mansfield, when
upon the stand, testifying as to the negotiations at the time of the
signing of the contract, says:

"Mr. Powers had the draft which Mr. Boynton had drawn up overnight. I
think Mr. Boynton had the old one, or else Mr. Powers had both. Mr. Powers
was excited and Mr. Boynton was excited, but talking in a low tone to them-
selves, and Mr. Powers pointed out to Mr. Boynton and said, 'You changed this
whole thing,' and Mr. Boynton said, 'No,' only that he changed the language,
not the sense. Mr. Powers looked down through, and concluded that it was
so, and he says, 'There was no such thing as that'—the paragraph relating to
the extension to Lake Placid—and Mr. Boynton said, 'No, but that was to
satisfy some of the directors who would be asking about the matter, and didn't
want to give the impression that the thing had been abandoned, but that it
was not binding upon us, and that it didn't make any difference in the con-
tract,' and he advised Mr. Powers to sign it, and Mr. Powers said all right
practically. Q. Did you state yesterday that Mr. Powers stated that that

was not to be in the contract, and Mr. Boynton replied, 'Well, that was to satisfy some of the directors or else they wouldn't sign the contract?' A. No sir, 1 don't think so. I will not swear I didn't. Q. That is the inference? A. That was the inference. Q. That they would not sign it if it was not in? A. No. * * * After that conversation Mr. Powers and myself went into the meeting of the board of directors, and the contract was signed with that provision in it. Q. Did anybody state to that board, or any member of it, that Mr. Boynton stated to you or to Mr. Powers that this provision in the contract was not binding upon you, and was inserted because some of the directors would not sign it otherwise? A. No, sir."

Mr. Mansfield is further asked:

"Q. It comes to about this, as you understand this contract, it imposes no obligation whatever on Powers and Mansfield to build any extension to Lake Placid? A. Yes, sir. Q. You have taken that position from the start and stuck to it? A. Yes, sir."

It appears that there were afterwards negotiations between the defendants and Mr. Culver of the Delaware & Hudson Company; that Mr. Willcox, the president of that company, did not want to take the contract because of this clause providing for the extension to Lake Placid. Mr. Mansfield swore that Mr. Culver did not think that was a serious matter:

"That it didn't involve us in the actual performance of that, and Mr. Willcox took issue, and the conversation came up on Mr. Willcox's part as to beginning within three years, and Culver made the remark, 'It is easily overcome by the showing of performance, laying a few rails,' which I thought was true, and that was Mr. Culver's remark, and Mr. Willcox didn't like that. Q. You thought Mr. Culver's view was true? A. Yes, sir. Q. A show of performance would be sufficient? A. Which constitutes an actual beginning. Q. You did agree with Culver's statement that if you began within three years and laid a few rails, that that would be sufficient? A. If it had any binding qualities, that would be an answer."

Now turn to Mr. Culver's evidence. He swears, in speaking of these negotiations:

"They (the defendants) tried to persuade us that the word 'commence' didn't mean anything, but just simply laying one rail, and that would comply with their obligation. We couldn't see it in that way. * * * We simply told them that unless that difficulty was removed we couldn't do anything. Q. Now what difficulty did you state, or did they state that you refer to as a difficulty? A. Well, they said there wasn't any difficulty because that word really didn't mean very much, and the whole arrangement didn't mean very much, and that they never expected to build the road."

Mr. Powers in his testimony admits that the contract that was originally brought was not satisfactory, and that he and Mr. Boynton, an attorney representing the directors, finally "arrived at a draft of contract which was satisfactory to them, Mr. Boynton said, and which I agreed to"; that Mr. Boynton was to put it in type, but that the contract produced the next morning differed from that agreed to; and Mr. Powers swears that it—

"had been changed, as I thought, radically all the way through, and then glancing down and coming to the bottom I saw this Lake Placid clause on the end of it, and I turned to Mr. Boynton—I was thoroughly angry—and I said, 'Here, this won't do; you have changed this thing all the way through.' He came over and leaned over, and said, 'Mr. Powers, these changes I have made are only changes in the verbiage, you will find; come this way and look them

over with me.' We stepped up, and I think Mr. Mansfield followed me over. Mr. Boynton proceeded to take the paper to show me that he had used his own legal form for the heading of the agreement, to which I could see no particular objection, and then he said, 'This matter of the escrow stock, you see, is just the same thing; I have only changed the wording a little.' I ran down through the agreement hastily with him—I should think we stood there perhaps five minutes or more looking the paper over—and finally I said, 'Here, you put this Lake Placid clause in here; we didn't agree to that.' He said, 'Oh, well, you are going to own the road; this didn't bind you in any way, but some of our directors wanted to have it put in there to show that the Lake Placid extension hasn't been given up.' I said, 'With that understanding, why, I will sign the paper; with your explanation I will sign the paper;' and we turned around, and I think I turned to the board then and said to them—I don't know but that I said it to them in Mr. Boynton's presence; I think he was there—I think I spoke out loud so they could all hear me, stepping up to the circle of the directors as they sat about the room; then I think Mr. Baber made some statement that they would take a vote on it, that the thing was apparently agreeable to them, and I think they passed a resolution authorizing him to sign the agreement."

He afterwards swears that he does not think the board of directors overheard this talk with Boynton, and that when he spoke to the directors he "didn't say a word to the board of directors, except that with Mr. Boynton's explanation I was ready to sign the contract." Now it will be borne in mind that this evidence of Mansfield and of Powers is explicitly contradicted by Boynton, and every one of the directors swears that this contract was authorized, not for the purpose of misleading the people of Keeseville, but upon the understanding that the defendants were assuming a binding obligation to construct or have constructed this extension to Lake Placid. Upon the testimony of the defendants themselves, however, it will be noted that this secret understanding which they claim was not with the directors, but was with Mr. Boynton. The purpose of this insertion in the contract, as sworn to by them, was to deceive the directors. Although Mr. Boynton was the agent of the directors, it can hardly be claimed that he represented them in any arrangement the purpose of which was to deceive his principals. To insert stipulations in a contract which are supposed not to be binding, for the purpose of deceiving the other contracting party, is playing with fire, and these defendants have little cause for complaint if that fire burns. Whatever may be the legal construction of the phraseology in this stipulation, upon their own testimony they knew that the directors supposed that they were getting from them a binding obligation to construct or have constructed this extension, and with that knowledge the contract becomes effective as containing such a stipulation. In Barlow v. Scott, 24 N. Y. 40, the headnote in part reads:

"A promise is to be interpreted in that sense in which the promisor knew that the promisee understood it."

In White v. Hoyt, 73 N. Y. 505, it is stated in the headnote:

"Where the terms of a promise admit of more senses than one, it is to be interpreted in the sense in which the promisor had reason to suppose it was understood by the promisee."

At page 511 of 73 N. Y., in the opinion, Allen, J., says:

"The rule in ethics is that, when the terms of a promise admit of more senses than one, the promise is to be performed in that sense in which the

promisor apprehended at the time the promisee received it, and this is the established rule at law as well as in morals. In the language of the books, it is to be interpreted in the sense in which the promisor had reason to suppose it was understood by the promisee."

In that case it was also held that, under circumstances similar to those in the case at bar, the interpretation of the contract might become a question of fact to be determined upon all the evidence surrounding the making of the contract. In the case at bar the referee has found with the plaintiff both as to what was understood by the directors of the company at the time the contract was made, and also as to what was expressly agreed between them and the defendants and was supposed by them to have been incorporated into the writing. The conclusion of the referee upon the fact finds full corroboration in the resolution passed by the board of directors in reference to delivering to the contractors the bonds of the road, which were demanded by the contractors. A resolution was passed that they might be delivered upon the giving of security upon the part of the contractors. That resolution recites—

"without waiving in any way any other covenant or obligation of said contract of June 10, 1903, to be performed on the part of said Powers and Mansfield as to the extension of said road to Lake Placid."

The evidence is to the effect that this resolution was voted for by both Powers and Mansfield, and it was so found by the referee. Powers and Mansfield denied that they voted for the resolution, but it is not pretended anywhere in the evidence that they raised any question at that time or at any other time as to the form of the resolution and its recognition of an obligation on their part as to the extension to Lake Placid.

As before indicated, it is not necessary to construe this contract as a personal obligation on the part of the contractors themselves to build the extension. Nor is it necessary that the damages for a breach should be so definite that the company could recover them in a legal action. If the contract be construed as before indicated, as a contract that the railroad company shall if possible build the extension and commence within three years, that is a substantive obligation, and, although the time has not expired within which work may be commenced, the plaintiff is not bound to wait until the expiration of the three years, because of the fact that the binding force of the contract is denied by the defendants, and all obligation thereunder is repudiated and disowned. In L. S. & M. S. Ry. Co. v. Richards, 152 Ill. 59, 38 N. E. 773, 30 L. R. A. 33, a similar question was presented, and the rule is thus stated in the opinion:

"It seems clear, both upon principle and by authority, that where one party to an executory contract refuses to treat it as subsisting and binding upon him, or by his acts and conduct shows that he has renounced it and no longer considers himself bound by it, there is, in legal effect, a prevention of performance by the other party, and it can make no difference whether the contract has been partially performed or the time for performance has not yet arrived."

This contract was to build that extension "as soon as practicable." The attitude of the defendants in renouncing all obligation thereunder disqualified them from determining when the building of the road

would be practicable, and at once creates a breach for which a rescission is authorized. Two years had passed since the contract was made, and no substantial effort has been made looking to the performance of this part of the contract. See, also, Burtis v. Thompson, 42 N. Y. 246, 1 Am. Rep. 516; Howard v. Daly, 61 N. Y. 362, 19 Am. Rep. 285; Ferris v. Spooner, 102 N. Y. 10, 5 N. E. 773. It cannot defeat the plaintiff's rights that, after the action was commenced, application was made by the defendant road for leave to increase its capital stock to $1,000,000 for the purpose of constructing this extension. Their application might well be deemed to have been made in bad faith when made by a party repudiating all obligation under the contract.

If we are right in these views, the learned referee properly concluded that the contract should be rescinded, and it becomes unnecessary for us to consider other grounds of rescission as found by him.

The interlocutory judgment from which this appeal has been taken has assumed to rescind and cancel this contract; has directed the defendants to return the 2,929 shares of the capital stock of the Keeseville Railroad Company which had been issued to said Powers and Mansfield, and restrain the said Powers and Mansfield from voting thereupon; has directed the return by the defendants Powers and Mansfield and the Powers & Mansfield Company, the assignees of the contract, of the bonds amounting to $145,000, with all coupons attached, and, in case of failure to deliver the said bonds, then the return of the par value thereof, with 10 per cent. in addition; has directed an accounting of the transactions of the defendants Powers and Mansfield of the receipts of the road and expenditures, and has given them a credit only for the moneys expended prior to March 5, 1905, at the time of the commencement of the action. The judgment has further directed the defendant the Keeseville National Bank to deliver and return to each stockholder of the defendant railroad company, or to its assignees, the certificate of stock deposited by the said stockholders with said bank, pursuant to a so-called escrow agreement, dated June 10, 1903. Further provision was made in reference to a contract that had been made by the Keeseville Electric Company, which will hereafter be referred to.

The appellant insists that at least the defendant should be allowed for all the moneys expended in the transformation of the road up to the time of the judgment, and that in this respect at least the judgment is wrong. The respondent contends in support of this judgment, first, that the rescission decreed is a rescission which operates from the time of the making of the contract, or at least from the time of the commencement of the action, and that all expenditures thereafter made were made by the defendants at their own peril. It is not necessary to decide here what may be the technical legal effect of this rescission, or as to when it is operative; nor is it necessary to decide as to what rights these defendants would have if they were in court in an affirmative action, asking reimbursements for the moneys expended. The equitable doctrine, that he who seeks equity must do equity, has no legal limitations to prohibit the court from making, as

a condition to the relief, such a compensation to a defendant as is just. It is a further rule in equity that a decree is based upon the facts existing at the time the decree is entered, and not upon the facts existing at the time the action is commenced. At the time this decree was entered this road had been nearly entirely transformed into an electric road, which was a step in the performance of the contract of material advantage to the road. To compel the defendants to remove their movable property, and not to allow them therefor, would be to compel them to sell it as secondhand property, which would cause a material loss to them, while this property is of material advantage to the railroad to retain. We have no doubt, therefore, that, while the defendants should be charged with all moneys received from the operation of the road and from the sale of bonds, they should also be allowed for all moneys expended in the execution of the contract made, whether expended before or after the commencement of the action. With this allowance made, it probably becomes unnecessary to determine the bona fides of the holders of certain of these bonds, which, as I understand, are held as collateral for moneys raised for the improvements of the road. The return to the company of the 2,929 shares of stock which were unissued at the time of the making of the contract is right. The direction that the Keeseville Bank return to the original holders, or their assigns, the stock deposited in escrow, is included in the judgment as incidental to the relief granted. While the stipulation made by the parties would submit to the court simply the rights of the railroad company as if the action were brought by the railroad company, the action appears to have been fully tried, and, if necessary, the court could relieve the plaintiff of the stipulation to the extent of authorizing the judgment transferring this stock by the bank to the individual who placed the same in escrow therein. But such in our judgment is not necessary. It would avail the company little if the majority of the stock were left with those who had no interest in or intention of extending the road to Lake Placid.

By the seventh clause of the contract, the company was to procure and the contractors pay for proper water power to operate said electric road, at a price mutually agreed upon. This power was not procured by the company prior to the time the company was passed over into the control of Powers and Mansfield, and thereafter the defendants, Powers and Mansfield, themselves purchased of the Keeseville Electric Light Company a majority of their stock, elected themselves directors of that company, and then made a contract with the railroad company for supplying electric power to the railroad company for the sum of $2,500 per year. Not having purchased the power for the company, Powers and Mansfield turned back to the railroad company $25,000 in bonds, which they deemed an equivalent for not having been required to purchase this power. The referee has found that the power was insufficient, the price was excessive, and that the contract was improvidently made for the railroad company, and should be set aside. There is sufficient in the evidence, at least, so that, if this railroad is turned back to the original stockholders, they should have the option to de-

clare the contract void, and we cannot say that this conclusion of the referee is against the weight of evidence.

The interlocutory judgment has determined that Albert E. Powers, as surviving partner of the banking firm of D. Powers & Sons, deliver up and return to the defendant railroad company, within 10 days from the entry of the judgment, 37 bonds of that company now held by the said banking firm as collateral security for moneys borrowed by the contractors. While it appears that 17 of these bonds were delivered to this banking firm after the commencement of this action, and as the said firm were parties to the action after they had notice of the plaintiff's claim, it appears that 20 of the bonds were held by the said banking firm prior to the commencement thereof. Whatever grounds of suspicion there may be that the said banking firm was not a bona fide holder of these bonds for value, there is no sufficient proof of mala fides upon its part, and as to such 20 bonds the interlocutory judgment should be modified so as not to require the said banking firm, or the survivor thereof, to return the same except upon payment of the amount for which they were originally delivered as collateral.

Our conclusion, then, is that this contract should be rescinded and annulled, and the parties placed as far as possible in statu quo, with an allowance to Powers and Mansfield and the Powers & Mansfield Company of the moneys necessarily and reasonably expended in the execution of the contract up to the date of the entry of this judgment, over and above the moneys that they have received from the road and from the sale of the bonds.

The interlocutory judgment should be modified in accordance with this opinion, and, as so modified, affirmed, without costs of this appeal to either party; the judgment to be settled before COCHRANE, J.

Judgment modified as per opinion, and, as so modified, affirmed, without costs to either party. COCHRANE and SEWELL, JJ., concur.

JOHN M. KELLOGG, J. (dissenting). The referee properly finds that the contract of June 10, 1903, contains the entire contract between the parties. It is not claimed that either party was ignorant as to the language used in the contract, or that any mistake was made in reducing it to writing, and neither party has asked its reformation. It must stand, therefore, as a statement of the rights and the duties of the parties with reference to the proposed extension to Lake Placid.

The referee finds, however, that the contract was intended by the company and its officers to provide for and secure the extension of the railroad to Lake Placid, and their understanding of the writing at the time it was signed was that by its terms it imposed upon Powers and Mansfield (hereinafter called the contractors) an obligation to extend said railroad, or cause the same to be extended, and to begin actual work on such extension within three years, and sooner if practicable, and that said contractors knew that the company and its officers understood it to provide for and require such extension.

We thus see that the referee has not construed the contract made between the parties, but has in fact made a new contract entirely different in its meaning and effect from the one which he finds the par-

ties actually did make. There is no finding of any failure to perform this part of the contract as actually written. Upon the theory that the contract required the contractors to build the extension to Lake Placid, and that after the contract was executed they said, when attempting to sell their interest in the contract to another, that they were not required to build the extension, and upon the trial they took a similar position, a rescission of the contract has been decreed practically forfeiting the many thousands of dollars which the contractors have expended in part performance of the contract with reference to electrifying and rebuilding the road.

Such determination is erroneous, for two reasons: (1) The contract is plain and speaks for itself, and is binding upon the parties unless in a proper action brought therefor it is reformed upon the ground that as written it does not carry out the contract actually made. (2) The facts do not sustain the findings of the referee that the contractors were bound by any conclusions which the company and its officers had as to the meaning of the contract signed.

The known facts leading up to the contract, briefly stated, are: The company in writing had offered the contractors all of its property for $1, if they would electrify the road and extend it to Lake Placid. May 8, 1903, the contractors wrote the attorney for the company, who was also a director and secretary, and who had the negotiations in charge, that there was not the proper material upon which to form an intelligent estimate for the extension, and that they were not willing to put in the money for a survey for that purpose, and that they, therefore, would surrender the option unless the company would turn over the property on some equitable arrangement with the stockholders and leave the question of the extension to the contractors, saying: "I take it you would not wish this extension completed unless it would pay." May 11th the attorney answers asking them to come and lay before the directors the proposition they thought was proper, saying:

"You will find them ready to enter into any just and reasonable arrangement. Of course we do not want any extension that will not pay, but putting the cost at what we know it can be built for and the receipts at a fair estimate we are fairly certain of its paying."

There is no suggestion that any survey or any estimate as to the probable expense of the building of the road was thereafter made by the company or the contractors.

Pursuant to the request in that letter, the contractors met the directors and presented to them a draft of the proposed arrangement, which said nothing about the Lake Placid extension, and explained fully to them each clause of the contract, and then retired from the meeting. Thereupon the directors appointed a committee, of which said attorney was one, to take up the matter of the contract with the contractors. In the evening the contractors and the attorney agreed upon several corrections to the proposed contract, which were to be written out by the attorney, and when they met the directors in the morning the proposed contract as written up by such attorney had in it this Lake Placid clause, to which the contractors objected, saying that that was put in the agreement without authority; and an interview was then had

between the contractors and the attorney, aside from the directors, in which the attorney stated, in substance, that the directors did not want it understood that the extension project was abandoned and that they wanted this clause in the contract, to which he added that it did not obligate them to build the road, and it would rest with them as the controllers of the company. The plaintiff was not present at the meeting June 10, 1903, when the contract was actually signed, but was there the previous day. On his direct examination he stated parts of the interview, and was asked:

"Q. Anything said as to when they were going to turn over the stock? A. That was practically all details; there was more talking than I can remember, but that was the substance of it, changing the road over and extension to Lake Placid at their and our option."

Some days later, on cross-examination, his attention was called to this testimony, and he says if he so answered he did not intend to do it; that maybe there was a mistake in the testimony; that it was furtherest from his mind that it rested in anybody's option; and then says:

"I don't say that I didn't say it, but I do say if I did say it I didn't intend to say it. Q. It dropped out unbeknown to you, then? A. Put it as you choose."

Adopting all of the evidence in behalf of the plaintiff as to what was said and done, the fact remains that the company and its representatives knew that the contractors had refused to take the road as a gift and extend it to Lake Placid, and had refused even to pay the expense of a survey, and claimed that an estimate of the cost of the road could not be otherwise made. They knew that the Delaware & Hudson Company had refused the road on substantially similar terms, and that both said parties felt that it was not practicable to make the large expenditure for the extension in view of the business in prospect. At the company's request, their attorney prepared this clause of the contract. Its language is their language, and the contractors reluctantly assented to it. The contractors say that they were induced to sign the contract by reason of the statements made by the company's attorney, who was also its director, that the contract did not obligate them to build the road. In substance the two contracting parties had disagreed. Each had presented his terms, which were rejected. One of the parties prepared a modified agreement satisfactory to it, and requested the other to adopt it, which they finally did. The parties were therefore dealing at arm's length with each other. Each is at liberty to stand upon the strict letter of the agreement, and, as stated before, the conversations and the intentions of the various parties are immaterial except so far as may be gathered from the instrument itself spread upon the known facts existing at the time of its execution.

If the contractors were to make the extension, clearly the agreement would have so provided, for it states particularly what the contractors agree to do and what the company is to do, and then provides:

"This contract is made upon the mutual understanding that said electric road is to be extended through the Ausable Valley to Lake Placid as soon as practicable and work to be begun within not longer than three years."

This was the mutual understanding of all the parties interested in the company, and outlined the future policy of the company, and bound

the good faith of the old and the new stockholders and officers to make the extension if it was found practicable so to do. No provision is contained for financing the extension. All were familiar with the valley, and knew that it was practicable to construct a railroad to Lake Placid so far as physical conditions were concerned. A survey of the road upon which an estimate of its cost could be based had not been made, and the mooted question was whether the country served would probably have business enough to warrant the expenditure of the money required, and whether such prospects, together with the mortgaged property of the company, could be capitalized for a sum sufficient to pay for the expenditure. The words "as soon as practicable" must refer, therefore, to the ability of the mortgaged company to make the extension upon the credit of the old road and the proposed extension, for no other arrangement had been made for money or capital for the extension. The contract and the conduct of the parties shows clearly an intention to surrender the stock and the bonds upon performance of the contract for rebuilding and electrifying the old road. No one assumed that such stock and bonds were to be used in any way in financing the proposed extension. The contractors as individuals assumed no more burden for the extension to Lake Placid than the other stockholders, except so far as they would in time represent the majority interest in the company. Undoubtedly the old stockholders expected that this contract eventually was to result in the extension of the road. The language used was theirs and was the best they could get, and, counseling their hopes rather than the terms of the contract, they felt that the contract would bring about the desired result. Apparently they were so sure that the proposed extension was necessary to the old company and would be profitable to its owners that they were willing to leave the matter for the action of the company upon the pledge of the good faith of all parties interested that the road should be built as soon as practicable. There is nothing to show that the contractors had in mind that the company believed they were personally liable under this clause to extend the road to Lake Placid, except so far as they might co-operate with the other owners of the property in such extension. No one swears to any suggestion which could be so interpreted.

The contractors were justified in saying that they were not bound to extend the road to Lake Placid because they had never agreed to do anything of the kind. The only breach of this provision in the contract is that, while attempting to sell their contract to the Delaware & Hudson Company, the contractors stated that they were not bound to build the extension, and upon this trial their attorney stated that Powers and Mansfield were not bound to build the extension. This cannot make a breach of contract. It was asserting their construction of the contract, and, so far as they personally were concerned, it was the correct construction, although they, with the other stockholders, were committed to the proposition that the company would extend its road to Lake Placid.

This action was brought March 5, 1905. The three years mentioned as the time within which to begin the extension had but about one-half

expired, and shortly after the action was brought steps were taken to increase the capital stock of the company for the declared purpose of enabling it to build the extension, which proceedings were stayed by the injunction issued in this case at the plaintiff's instance.

We must assume that the contractors did not believe that they were assuming a personal obligation to build the extension, and that any obligation with reference to it rested upon the company and the stockholders mutually as members of the company. If the company's attorney represented to them that the contract did not obligate them to build the road, they had all the more reason to believe that such was the true construction of the understanding. This is entirely immaterial, except so far as it depends upon the good faith of the contractors and tends to show that they believe they personally were not assuming any direct obligation. If a man signs a contract and then states his honest view of its construction, that cannot be turned into an abandonment of the contract or such an act of bad faith in making it that his acts under the contract may be forfeited, especially where he is only repeating the statement made to him by the attorney of the other contracting party by which he was induced to execute the contract. Good faith, at least, and the rules of equity require that under such circumstances a demand for performance should be made, so that, if not properly advised as to his rights, he may act deliberately with reference to them. Plaintiff, as a stockholder and one of the old directors who was a party to the contract, has never requested that the company enter upon or consider the matter of the proposed extension to Lake Placid, and it does not appear that any stockholder or officer of the old company has ever made such a request to the contractors or the stockholders of the company. He has been as dilatory in that respect as the contractors, and where the obligation is mutual, as here, he is not in a position to claim that the facts make such a breach of the contract as to justify a rescission at his instance.

There is no evidence that it was practicable for this company, with its seven miles of road mortgaged for $175,000, to build an extension to Lake Placid at a probable cost of $1,000,000. No suggestion has been made as to how the company could finance such an enterprise. Clearly it would be necessary to establish the cost of the extension and to.furnish reliable data as to the probable earnings of the road before financial assistance could be afforded to the extent necessary to bring about the result. No stockholder or director has ever suggested a plan or requested the company to seriously take the matter up for action, except so far as the defendants themselves sought to increase the capital stock of the company for that purpose, which was interrupted by the plaintiff's injunction.

Some acts tending to a performance of the contract with reference to rebuilding and electrifying the old road took place immediately after the execution of the contract, and a large amount of money was expended. After action brought the contractors entered actively upon the performance of the contract, and have spent large amounts of money and substantially rebuilt the road. Immediately after the contract the contractors purchased for the company the Port Kent dock

and entered into negotiations with the Delaware & Hudson Company for the right to cross their tracks. When the contractors became satisfied that they could not obtain the right to cross the tracks as desired, they made a formal report, November 3, 1903, to the company of the situation, and asked the company to appoint an attorney so they might be in position to force the crossing. This report was voted on file, and the company entered into independent negotiations with outside parties to see if they could not effect an amicable adjustment with the railroad company. No attorney was appointed until the next spring, when the contractors elected their board of directors.

The plaintiff threatened to resign as a director if the company got into any controversy with the Delaware & Hudson Company about the crossing before the road was rebuilt down to the crossing. Probably much of the delay was caused by his trying to force his views upon the contractors and the company, when it was for them and not him to determine how the work should be done. There was much delay by the company in placing the stock in escrow as agreed; some delays were caused by supposed or actual legal complications, some perhaps from other fault of the company, its officers or others, and some from the apparently unreasonable neglect of the contractors. The plaintiff at the time the contract was made owned 20 shares of $10 each of the capital stock of the company. After the principal delays had occurred, and before action brought, he had purchased 2,172 shares more of stock, and at the time of the trial owned 2,489 shares. The stock acquired by him since the contract was for substantially a nominal consideration. Before he can be allowed to speculate as to the construction of the contract and the transactions in which he was a party, he should at least be required to put the contractors upon strict performance by proper notice requiring the execution of the contract upon their part. The delays suffered, apparently acquiesced in by him and the others, required some action upon his part, at least before he can enforce a forfeiture. St. Regis Paper Co. v. Santa Clara Paper Co., 186 N. Y. 89, 78 N. E. 701. It is evident that the contractors have not fully rebuilt and electrified the road according to the terms of the original contract, and that they have obtained the bonds from the company before they were entitled to the same according to the terms of the contract. It is therefore proper that the injunction restraining the sale or disposition of the bonds should continue until the determination of the action or until the further order of the court.

I favor a reversal of the judgment and a new trial, with costs to the appellant to abide the event.

CHESTER, J., concurs.